**Maureen MONROE, Plaintiff,**

v.

**PACIFIC TELESIS GROUP COMPREHENSIVE DISABILITY BENEFITS PLAN, Defendant.**

**No. CV 96–3158 DDP (SHX).**

United States District Court, C.D. California.

Feb. 24, 1997.

Elizabeth R. Lishner, Santa Monica, CA, Donald C. Clark, Jr., Chicago, IL, for plaintiff.

William E. Matsumura, Joan S. Ortolano, Jonathan L. Daniel, Pacific Bell Legal Dept., Los Angeles, CA, for defendant.

## ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF

PREGERSON, District Judge.

This matter comes before the Court on cross-motions for summary judgment. Oral argument was heard on February 10, 1997. After consideration of the parties' oral and written arguments, the file in this case, and the applicable authorities, the Court hereby grants summary judgment in favor of Plaintiff.

*BACKGROUND*

Plaintiff Maureen Monroe ("Monroe") was employed by Pacific Bell from August 1972 to March 1996; the last day she actually reported to work, however, was in October 1994. At issue is whether Monroe in entitled to short term disability benefits for the period October 1994 to October 1995.

Monroe participated in the Pacific Telesis Group Comprehensive Disability Benefits Plan ("Defendant" or "Plan"), which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan provides short term disability benefits to participants who are absent from work, for temporary periods of 52 weeks or less, because of short term disability. The Plan provides long term disability benefits to participants who, because of long term disability, do not return to work when short term disability

benefits have been exhausted. The Plan defines short term disability as:

> a sickness, injury or other medical, psychiatric, or psychological condition which prevents an employee from engaging in his or her normal occupation or employment with the Participating Company or such other occupation or employment as he or she is assigned in accordance with the Participating Company's normal practices.

(Lishner Decl., Ex. 17.)

In about July 1994, Monroe allegedly began experiencing stiffness, numbness and pain. She states she was unable to sleep more than two or three hours at a time. Her memory declined, and she began losing track of customer orders and files. She also could not sit at a computer or use the telephone without pain, and was fatigued all the time. (Monroe Decl., ¶ 10.)

In October 1994, Monroe's regular physician referred her to Dr. Allan Metzger, a rheumatologist specializing in the treatment of fibromyalgia. Dr. Metzger concluded that, among other illnesses, Monroe had profound fibromyalgia. (Pltf's Ex. 12.) Fibromyalgia is described as:

> commonly entertained in the presence of unexplained widespread pain or aching, persistent fatigue, generalized morning stiffness, non-refreshing sleep, and multiple tender points. Most patients with these symptoms have 11 or more tender points. But a variable proportion of otherwise typical patients may have less than 11 tender points at time of examination.

Further, fibromyalgia is often:

> Part of a wider syndrome encompassing headaches, irritable bladder, dysmenorrhea, cold sensitivity, Raynaud's phenomenon, restless legs, atypical patterns of numbness and tingling, exercise intolerance, and complaints of weakness.

(Pltf's. Ex. 20 (Rothenberg Depo.); Pltf's. Ex. 15 (Report of Dr. Weinberger, quoting a 1990 study of the American College of Rheumatology).)

Dr. Metzger's prescribed treatment for Monroe included a pain and sleep disorder program as well as additional medication. (Monroe Decl., ¶ 12.) Nonetheless, Monroe continued to experience symptoms, and missed several days of work. Monroe then received a call from Janet Hardy ("Hardy"), a nurse for Pacific Bell's Disability Assistance Program ("DAP"). When Monroe told Hardy that the reason for her medical absence was fibromyalgia, Hardy allegedly replied "Oh, we don't pay for that." (Monroe Decl., ¶ 13.) Monroe received the appropriate forms and applied for short term disability.

In evaluating a claim for disability benefits, the DAP relies on written guidelines regarding the nature of the illness at issue and its likely duration. (Rothenberg Depo. at 34–38.) Defendant's medical guidelines have no entries for fibromyalgia. (*Id.* at 39–40.) If a claim is not on the list of diseases covered by the guidelines, the DAP must get more information about the disease. (*Id.* at 43.) Defendant failed to do so.

The DAP referred Monroe to Dr. Mark Hyman, an internist, for an examination. Dr. Hyman is not a specialist in rheumatology. After examining Monroe for five minutes (Monroe Decl., ¶ 16), Dr. Hyman found no objective evidence to substantiate her symptoms. (Rothenberg Decl., Ex. E.) Dr. Hyman did not question Monroe about her job duties, as is customary when trying to determine if the claimant can continue working.

However, Dr. Hyman did ask Monroe about her home activities, and stated in his report "It is noteworthy that she clearly performs many activities in the home environment, which are far greater than the requirements of her sedentary position." (Pltf's Ex. 2.) When asked about her home activities, Monroe told Dr. Hyman that she bathed and dressed herself. She stated she did not fix regular meals, but might make a bowl of cereal or toast. She did not do any grocery shopping or clean house. She could not do laundry at that time. She was sometimes able to drive for short periods only because of the recurrence of numbness in her arms. (Monroe Decl., ¶ 18f.) Dr. Hyman reevaluated Monroe several months later and reiterated his earlier opinion. (Pltf's Ex. 5.)

Monroe's disability claim was denied, effective October 27, 1994. (Rothenberg Decl., ¶ 13.) Monroe subsequently received benefits from December 19, 1994 through March 8, 1995 on the basis of a psychiatric disability for depression. (*Id.* at ¶ 14.) These benefits were stopped based on her treating physician's medical certificate, which stated that "The patients's depression appears to be secondary to her medical condition, Fibromyalgia, which is causing severe fatigue and musculoskeletal pain, which may be at disabling severity. Her depression is not." (*Id.* at ¶ 15 and Ex. F thereto.)

Monroe appealed the denial of further short term disability benefits. Monroe presented additional evidence in support of her claim, including Dr. Metzger's August 14, 1995 report, a sleep study, and other documents. The sleep study showed that Monroe's sleep was abnormal, and in particular, that she suffered from a lack of REM sleep. (Pltf.'s Ex. 4.) Dr. Rothenberg, the Plan's Associated Medical Director, is responsible for overseeing the DAP. Dr. Rothenberg, who is not a specialist in rheumatology, testified at his deposition the he made no attempt to determine the importance of Monroe's lack of REM sleep and dismissed its significance. Plaintiff's appeal was denied.

After this action was filed, counsel for Defendant requested that Plaintiff be examined by a specialist in rheumatology. Plaintiff consented and was examined in July 1996 by Dr. Alan Weinberger, who was selected by Defendant. Dr. Weinberger's report concluded that Monroe "clearly satisfied the American College of Rheumatology Criteria for Fibromyalgia." (Pltf's Ex. 15.) Dr. Weinberger further concluded that "I concur with Dr. Metzger that Ms. Monroe is currently totally disabled and unable to perform the substantial duties of her employment, or of any comparable sedentary work." (*Id.*) In reaching this conclusion, Dr. Weinberger found that Monroe's sleep studies strongly validated her claims. (*Id.*)

1. Some cases state that the "arbitrary and capricious" standard is applied, whereas others use the term "abuse of discretion." These terms are

*DISCUSSION*

A. *Legal Standard*

The parties agree that Defendant's decision to deny benefits is reviewed under the abuse of discretion standard [1] because "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989).

 Even under the abuse of discretion standard, additional scrutiny may be warranted where there is a conflict of interest. An apparent conflict of interest exists where the plan administrator is also the insurance company. "If that formal conflict led to a true conflict, the standard of review would not exactly change, but scrutiny of [defendant's] decision would become more searching." *Snow v. Standard Ins. Co.,* 87 F.3d 327, 331 (9th Cir.1996). This "less deferential" standard applies only when the beneficiary has provided material, probative evidence tending to show that the fiduciary's self-interest caused a breach of the administrator's fiducial obligations to the beneficiary. *Id.* The mere fact that benefits were denied is insufficient. *See Atwood,* 45 F.3d at 1317.

Plaintiff contends that Defendant has a preconceived position with respect to denial of claims for disabilities related to fibromyalgia. Thus, Monroe argues that the Court should examine her denial of benefits under the heightened scrutiny standard.

The Court need not resolve this issue. Even without applying heightened scrutiny, the Court finds that Defendant abused its discretion.

B. *Record on Review*

 When the abuse of discretion standard is applied, review is generally limited to the administrative record. Otherwise, a court could decide that a plan administrator abused its discretion based on evidence not even before the administrator. Moreover, as

used interchangeably and "differ in name only." *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1321 n. 1 (9th Cir.1995).

the Ninth Circuit stated in *Taft v. Equitable Life Assur. Soc'y:*

> Nothing in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators, a role they would inevitably assume if they received and considered evidence not presented to administrators concerning an employee's entitlement to benefits. Such a procedure would frustrate the goal of prompt resolution of claims by the fiduciary under the ERISA scheme.

9 F.3d 1469, 1472 (9th Cir.1993) (quoting *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir.1990)).

Plaintiff argues that Defendant opened up the administrative record by requesting the examination by Dr. Weinberger. Defendant asked Dr. Weinberger to determine not only whether Monroe was currently disabled, but also when the disability commenced. (Pltf's Ex. 21.) Thus, Plaintiff argues that Defendant was, in essence, asking Dr. Weinberger whether the decision to deny Monroe's claim was proper. As such, Plaintiff contends that Defendant was reopening the appeal process.

▪ Defendant argues that if the administrative record is opened, the Court should also consider the fact that Monroe was denied Social Security benefits. The Social Security matter is currently being appealed, however. In any event, decisions by Social Security are not binding on plan administrators. *See Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279 (9th Cir.1990) (favorable Social Security determination not binding).

The Court is reluctant to consider Dr. Weinberger's report part of the administrative record. Dr. Weinberger examined Monroe after this litigation was filed, and his report was not before Defendant when Monroe's request for benefits was denied. The fact that Defendant did not consult Dr. Weinberger (or another independent expert in rheumatology) prior to making its benefits determination, however, may in itself constitute an abuse of discretion, as discussed below.

## C. Abuse of Discretion

### 1. Relied on Report of Physician Who Lacked Necessary Qualifications

Plaintiff contends that Defendant abused its discretion by relying on the report of a physician who was not qualified to assess Monroe's disability. The DAP relied on Dr. Hyman's reports and Dr. Rothenberg's examination of the evidence. Neither of these physicians is a specialist in rheumatology.

Dr. Hyman, an internist, conducted two 5–minute examinations. He did not ask Monroe what her job duties were, but merely relied upon a letter from the DAP describing her job duties as follows: "Sales support manager. Sedentary position, working in an office using fax machine, computer, telephones, not lifting." (Pltf's Ex. 6.) Dr. Hyman found that she was not disabled because the job did not require lifting in excess of 25 pounds. Unlike Dr. Metzger, Dr. Hyman did not comment on Monroe's specific job duties, such as whether Monroe could engage in upper extremity use like typing or using a computer. Dr. Hyman did not address whether Monroe was capable of remaining stationary for longer than 30 minutes at a time, or whether Monroe would have difficulty using the telephone for prolonged periods of time. Dr. Hyman did not comment on the significant number of medications being taken by Monroe.

Defendant contends that Dr. Hyman specializes in occupational medicine and as such was qualified to assess whether Monroe was disabled. However, Defendant has failed to adequately establish that Dr. Hyman is in fact a specialist in occupational medicine; Rothenberg's declaration in this regard lacks foundation. Moreover, the Court is not convinced that a specialist in occupational medicine is more qualified than a rheumatologist to determine whether a fibromyalgia patient is disabled.

In any event, Dr. Hyman's determination that Monroe was not disabled was based at least in part on findings he was not qualified to make. For example, Dr. Hyman stated in his December 20, 1995 letter to Dr. Rothenberg that contrary to Dr. Metzger's examination, he found Monroe's physical examination

"to lack reproducibility in her myofascial trigger points." (Pltf's Ex. 14.) However, Dr. Hyman is not a rheumatologist, and not qualified to make such a diagnosis. As Dr. Metzger explained in his August 14, 1995 letter,

> the average non-rheumatologist is unaware of some of the subtle fibrositic trigger points that these patients manifest.... These are subtle, not run of the mill physical findings....

(Pltf's Ex. 12.)

■ Because Dr. Hyman does not have the requisite expertise and did not consider all the relevant facts, his report does not constitute substantial evidence. Thus, Defendant abused its discretion by relying on his report.

### 2. *Defendant Disregarded the Opinion of the Treating Physician*

Monroe further contends that Defendant abused its discretion by disregarding the opinion of Dr. Metzger, Monroe's treating physician. The treating physician's opinion is generally entitled to greater weight than that of the non-treating physician. The Ninth Circuit has held in the Social Security context that the treating physician's opinion may be disregarded only where there are specific, legitimate reasons for doing so that are based on substantial evidence in the record. *See Murray v. Heckler,* 722 F.2d 499, 501–02 (9th Cir.1983)[2]; *cf. Donaho v. FMC Corp.,* 74 F.3d 894, 901 (8th Cir.1996) (reviewing physician's opinion entitled to less weight than treating physician in ERISA disability cases). The *Murray* court explained, quoting the Fifth Circuit,

> "Our reliance on the opinion of the treating physician is based not only on the fact that he is employed to cure but also on his greater opportunity to observe and know the patient as an individual."

*Murray,* 722 F.2d at 502 (quoting *Bowman v. Heckler,* 706 F.2d 564, 568 (5th Cir.1983)). Here, it makes even more sense to give greater weight to the opinion of the treating

physician who is a specialist in the relevant field, rather than to the opinion of the examining physician, who is a "family doctor."

Defendant contends that it rejected Dr. Metzger's opinion because he did not describe objective evidence of impairment. However, Dr. Metzger's report did in fact describe objective evidence besides Monroe's subjective complaints of pain. For example, Dr. Metzger discussed Monroe's lack of REM sleep as shown in the sleep study, noting that such lack of sleep inhibits growth of certain hormones essential to good muscle function. (Pltf's Ex. 12.) Dr. Metzger also noted that Monroe suffers from the trigger points set forth by the American College of Rheumatology. In addition, Dr. Metzger stated that Monroe has "a low titer antinuclear antibody with a speckled pattern which is seen in thirty to forty percent of patients with fibromyalgia." (*Id.*)

■ Dr. Metzger's report is much more detailed than Dr. Hyman's and is accompanied by specific clinical and laboratory findings. The Court holds that Defendant abused its discretion by giving more weight to Dr. Hyman's report than to Dr. Metzger's report.

### D. *Failure to Consult an Independent Expert*

Defendant's failure to consult an independent expert may also have been an abuse of discretion and evidence of bad faith. *See Sansevera v. E.I. DuPont de Nemours & Co.,* 859 F.Supp. 106, 112–13 (S.D.N.Y.1994). Monroe and Dr. Metzger urged Defendant to seek the opinion of an independent physician specializing in rheumatic disease. (Pltf's Ex. 12.) Nonetheless, Defendant did not do so until after this litigation was filed.

Pursuant to Defendant's request, Plaintiff was examined by Dr. Weinberger, a physician of Defendant's choosing, who is a specialist in rheumatology. Dr. Weinberger's report confirms Dr. Metzger's determination that Monroe is disabled. Defendant now contends that the report is late and not part

---

**2.** Social Security disability cases are useful precedent in ERISA actions. *See, e.g., Jenkinson v.*

*Chevron Corp.,* 634 F.Supp. 375 (N.D.Cal.1986).

of the administrative record. However, Defendant may have abused its discretion by not having requested such an examination prior to making a determination of benefits.

CONCLUSION

The Court finds that Defendant abused its discretion. Accordingly, summary judgment shall be entered in Plaintiff's favor. Defendant is hereby ordered to provide to Monroe short term disability benefits for the period October 27, 1994 to October 27, 1995 and all other benefits which would have accrued to her had the benefits been granted initially.

IT IS SO ORDERED.