Rosalie **SIEBERT**, Plaintiff,

v.

**STANDARD INSURANCE COMPANY GROUP LONG–TERM DISABILITY POLICY**, Defendant.

No. CV 00–13407GAF(RCx).

United States District Court, C.D. California.

July 9, 2002.

Elizabeth R. Lishner, Elizabeth R. Lishner Law Offices, Santa Monica, CA, for Plaintiff.

Martin E. Rosen, Maria A. Audero, Barger & Wolen, Los Angeles, CA, for Defendant.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

FEESS, District Judge.

## I.

## INTRODUCTION

This is an ERISA case in which Standard Insurance Company ("Standard") limited Rosalie Siebert ("Siebert") to two years of disability benefits under her employer's group disability plan. Siebert sues Standard because she claims she is permanently disabled and is therefore entitled to substantial additional benefit payments under the policy. The dispute centers on the two bases for Standard's termination of benefits. First, Standard concluded that Siebert's disability—an alleged inability to work due to fatigue, low energy, and an inability to focus and concentrate—was caused at least in part by a mental disorder, for which the policy limits benefit payments to two years. Second, Standard concluded that, after two years, Siebert was entitled to disability benefits only if she was disabled from working in "any occupation" for which she was qualified by reason of education, training and experience. Because Standard concluded that Siebert could work in a variety of occupations, Standard determined that Siebert was not entitled to benefit payments beyond two years.

The parties now present the Court with cross-motions for summary judgment. The dispute initially focuses, as nearly all of these cases do, on the standard of review. If the Court reviews the case using the abuse of discretion standard, then the Court reviews the administrative record to determine whether substantial evidence exists in the file to support the decision to terminate benefits, even if contrary evidence may be present. If the administrator's decision is reviewed de novo, however, then the Court gives no deference to the administrative determination and may even take additional evidence to assist it in understanding the administrative record, although in the end the case must be resolved on the basis of the evidence presented to the plan administrator.

Both parties agree that the plan confers discretion on the administrator, and that

an apparent conflict of interest exists because Standard both administers the plan and funds the benefit payments under the policy. Siebert, however, argues that an actual conflict exists and that the Court must therefore apply a de novo standard of review, which she contends will result in summary judgment in her favor. Standard acknowledges that the de novo standard would apply if an actual conflict existed, but contends that the record fails to demonstrate an actual conflict. Hence, Standard contends that the abuse of discretion standard should apply, which Standard contends will result in summary judgment in its favor.

After reading the parties' papers, reviewing the administrative record, and hearing the arguments of counsel, the Court concludes Siebert has not presented sufficient evidence that a conflict of interest actually infected Standard's denial decision. Thus, the applicable standard of review is that of abuse of discretion, and under this standard, the Court finds that substantial evidence in the record supports Standard's decision.

## II.

### FACTUAL BACKGROUND

#### A. THE POLICY

Plaintiff Siebert, while employed by Louis Kravitz & Associates, Inc. as a Vice President/Consultant of Pension and Retirement Plans, participated in a group long-term disability insurance policy (the "Policy") through Defendant Standard. (PSUF ¶¶ 3, 4).[1] Standard is the Policy's insurer and claims administrator. (Id. ¶ 5).

The Policy provides two years of disability benefits for participants who become disabled from their "own occupation." (STND 0107).[2] After the two year period expires, a participant can recover disability benefits only if she becomes disabled from any occupation. (Id.) The Policy states in relevant part:

> You are Disabled from all occupations if, as a result of Sickness, Injury or Pregnancy, you are unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training and experience.

(PSUF ¶ 5). Additionally, a participant's recovery of long-term disability ("LTD") payments for conditions caused or contributed to by a mental disorder is limited to two years. (Id. ¶ 8). The Policy defines "mental disorder" to include "a mental, emotional, behavioral, or stress-related disorder." (Id. ¶ 7).

#### B. THE CLAIM

Siebert claims that on February 10, 1997, she became unable to work due to "extreme fatigue and low energy combined with an inability to focus, concentrate and remember." (DSUF ¶¶ 9, 10). In May 1997, Siebert submitted a written claim for disability benefits. (Id. ¶ 11). Accompanying the claim was a statement by Siebert's treating physician, Dr. Michael J. Goldberg, indicating a primary diagnosis of Mono Syndrome and a secondary diagnosis of fibromyalgia.[3] (Id. ¶¶ 13, 14). Dr. Goldberg's statement noted that the initial occurrence of Siebert's Chronic Fatigue Syndrome ("CFS") and fibromyalgia

---

1. Hereinafter, "PSUF" refers to the Statement of Undisputed Facts offered in support of Plaintiff's motion, while "DSUF" refers to the Statement offered in support of Defendant's motion.

2. "STND" refers to the bates numbers of the Joint Administrative Record.

3. Dr. Goldberg stated that he used the term "Mono Syndrome" to refer to Chronic Fatigue Syndrome. (DSUF ¶ 14).

("FMS") was in December 1993. (*Id.* ¶ 15).

## C. STANDARD'S REVIEW AND APPROVAL OF SIEBERT'S CLAIM

After receiving additional medical records from Dr. Goldberg, Standard had Dr. Bradley J. Fancher, a Physician Consultant and a board-certified internist, conduct a review of Siebert's claim on July 2, 1997. (*Id.* ¶¶ 16, 17). Based on the medical records before him, Dr. Fancher could not determine whether Siebert met the American College of Rheumatology ("ACR") criteria for FMS.[4] (*Id.*) In addition, because Dr. Fancher views CFS as a diagnosis of exclusion, he suggested Siebert undergo a psychiatric independent medical examination ("IME") to determine whether she has a psychological illness that could account for her reported symptoms. (*Id.*)

On August 19, 1997, Standard followed Dr. Fancher's suggestion and retained psychiatrist John Hochman, M.D., an assistant clinical professor in the Department of Psychiatry at UCLA Medical School, to conduct an IME. (*Id.* ¶ 18; STND 0768). After meeting with Siebert and reviewing her medical records, Dr. Hochman concluded that she might suffer from a depressive or somatoform disorder. (DSUF ¶ 19). Although Dr. Hochman

found Siebert mildly to moderately impaired, he believed her self-reported degree of impairment was unreasonable. (*Id.*) Dr. Hochman's evaluation revealed no deficits in Siebert's cognitive abilities and he believed her physical complaints were most likely caused by depression. (*Id.* ¶ 21).

Dr. Fancher reviewed Siebert's claim file for the second time on September 8, 1997. (STND 0474). Dr. Fancher acknowledged that Dr. Goldberg's notes indicate that he identified tender points which he believed to be consistent with the diagnosis of FMS and that he believed Siebert met the criteria for CFS.[5] (PSUF ¶ 17; STND 0474). Dr. Fancher, however, expressed uncertainty as to whether CFS or FMS are caused by physical factors or mental factors. (STND 0474). In addition, Dr. Fancher concluded that a diagnosis of FMS should not prevent someone from performing sedentary to light work. (*Id.*) Moreover, Dr. Fancher believes that the mere application of CFS criteria does not connote a specific diagnosis or a specific degree of impairment, and therefore he viewed Dr. Goldberg's diagnosis of Siebert's CFS as speculative and lacking scientific validity. (*Id.*)

On September 10, 1997, Standard approved Siebert's claim, with retroactive disability payments beginning as of April

---

4. The ACR diagnostic criteria for FMS requires (1) history of widespread pain; and (2) pain in eleven of eighteen tender point sites. (STND 0757–0758).

5. CFS, according to the U.S. Department of Health and Human Services Center for Disease Control's ("CDC") 1994 criteria, is defined by "the presence of the following: (1) clinically evaluated, unexplained persistent or relapsing chronic fatigue that is of new or definite onset (has not been lifelong); is not the result of ongoing exertion; is not substantially alleviated by rest; and results in substantial reduction in previous levels of occupational, educational, social or personal

activities; and (2) the concurrent occurrence of four or more of the following symptoms, all of which must have persisted or recurred during 6 or more consecutive months of illness and must not have predated the fatigue: self-reported impairment in short term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social or personal activities; sore throat; tender cervical or axillary lymph nodes; muscle pain; multi-joint pain without joint swelling or redness; headaches of a new type, pattern or severity; unrefreshing sleep; and post exertional malaise lasting more than 24 hours." (STND 0044).

11, 1997. (DSUF ¶ 22). Following approval of the claim, Standard required Siebert to submit a claim for Social Security benefits in order to help offset its own payments. (PSUF ¶¶ 31, 32). After Siebert's initial claim for Social Security was denied, Standard provided her with an attorney to assist her with the appeal. (*Id.* ¶¶ 34, 35). On appeal, the Administrative Law Judge awarded Siebert Social Security benefits after finding that the severity of her "somatoform disorder" satisfied the definition of disability under the Social Security Act. (*Id.* ¶ 36; STND 0270). According to the ALJ, the medical evidence established that Siebert has severe CFS, FMS, obesity, and somatoform disorder. (STND 0270).

### D. STANDARD'S TERMINATION OF SIEBERT'S BENEFITS

Approximately six months after Standard approved Siebert's claim, Standard advised Siebert that the Policy limited payments of LTD benefits to 24 months for conditions caused or contributed to by a mental disorder and that it was conducting an investigation to determine if the limitation applied to her claim. (DSUF ¶ 23; STND 0450). Before the mental disorder limitation period expired, Standard requested and received additional medical records from Siebert's treating physicians, Dr. Goldberg and Dr. Jeremy Cole. (DSUF ¶ 24). Standard then had Dr. Ronald C. Fraback, a Physician Consultant and a board-certified rheumatologist, review Siebert's claim in March 1999. (*Id.* ¶ 25). Dr. Fraback could not identify a specific disease which would account for Siebert's reported symptoms. (STND 0303). Although he believed Siebert might have FMS, he did not find adequate documentation supporting such a diagnosis. (DSUF ¶ 26). In any event, Dr. Fraback believed that such a condition would not physically prevent Siebert from perform-

ing sedentary to light work on a full-time basis. (*Id.* ¶ 27).

In November 1999, after reviewing the file once again, Dr. Fancher concluded that Siebert's symptoms were most likely caused by a mental illness, not CFS or some other physical ailment. (*Id.* ¶¶ 30, 31). In addition, Dr. Fancher concluded that patients with FMS should be able to perform light to sedentary work and he found nothing in Siebert's medical records suggesting Siebert was physically limited from performing such work. (*Id.* ¶ 32).

Standard also referred Siebert's file to Linda Knickrehm, a vocational consultant, and asked her to identify alternative occupations available to Siebert, taking into consideration her education, training, experience, and physical limitations. (*Id.* ¶ 33). Based on Dr. Fancher's opinion that Siebert is able to perform light to sedentary work, Knickrehm concluded that Siebert could return to her prior occupation as Vice President, or work as a Personnel Manager or Investment Analyst. (STND 0123).

Standard concluded its review of Siebert's claim in January 2000 and came to the determination that Siebert's disability was caused or contributed to by a mental disorder. (DSUF ¶ 36). Because the Policy limited LTD benefit payments to 24 months (i.e., April 1997 to April 1999), Standard concluded that Siebert was no longer entitled to receive disability payments. (*Id.* ¶ 36). In addition, Standard believed Siebert's claim should be closed because she had not provided sufficient medical proof that a physical illness, such as FMS, caused her to become "disabled" under the "all occupation" definition. (*Id.* ¶ 37). Accordingly, Standard sent Siebert a letter on January 31, 2000 explaining to her these findings and advising her that she could request a review of the claim decision. (*Id.* ¶¶ 35–38).

## E. SIEBERT'S APPEAL

Siebert appealed Standard's decision to terminate her LTD benefits on September 5, 2000. (*Id.* ¶ 39). On appeal, Dr. Goldberg submitted a letter to Standard explaining why he believed Siebert met the criteria for CFS and FMS. (PSUF ¶ 48). Dr. Goldberg also indicated that Siebert was not capable of continuous, full-time work. (*Id.*) On appeal, Siebert also challenged the findings of the vocational analyst by explaining that her spotty memory and lack of concentration impaired her ability to work, and that she did not have the transferable skills identified by the vocational analyst. (*Id.* ¶ 49; STND 0041).

In an eleven-page letter dated June 4, 2001, Standard notified Siebert of its final determination to close her file and terminate her benefits. (DSUF ¶ 42; STND 0751–0761). Standard explained that its determination was based on, *inter alia*, the fact that some of the treatment and opinions offered by Siebert's treating physicians were contrary to generally accepted medical practice, and that Siebert herself admitted she had been able to work full-time, for over four years, after first being diagnosed with FMS and CFS in 1993. (DSUF ¶ 46).

In the June 4, 2001 letter, Standard stated that CFS and FMS are controversial diagnoses because no diagnostic tests can establish their presence as a discrete disease entity. (STND 0752). Standard treats CFS as the result of a physical sickness only when all other possible causes are ruled out and the medical evidence supports the reported disabling level of impairment. (STND 0753). Standard stated that Dr. Goldberg's diagnosis of CFS was not supported by general medical practice because he merely relied on the CDC case definitions for CFS as evidence that Siebert's symptoms were caused by a physical, rather than a mental condition. (*Id.*) Standard explained that the CFS di-agnostic criteria, however, was designed for research purposes only and should not be used to determine the presence and severity of the illness. (*Id.*) Standard also discounted Dr. Goldberg's opinion that an abnormal SPECT scan is evidence of a physical condition because even the CDC has recognized that SPECT scans do not have a demonstrated value in the diagnosis of CFS. (*Id.*) Based on the medical evidence presented, Standard found that Dr. Fancher's conclusion that Siebert's CFS symptoms were most likely due to a mental disorder was more reliable than the opinions of Siebert's treating physicians. (STND 0756–0757).

Similarly, Standard disagreed with the diagnosis of FMS made by Siebert's treating physicians. (STND 0758). After reviewing Dr. Goldberg's treatment records, Standard did not find sufficient evidence that Siebert met ACR's diagnostic criteria for FMS. (STND 0757–0758). Although Dr. Goldberg stated that Siebert did meet the ACR criteria, Standard relied on Dr. Fraback's opinion that Dr. Goldberg's diagnosis was not supported by his chart notes. (STND 0758). Dr. Fraback also noted that Dr. Goldberg, as a pediatrician, does not specialize in evaluating FMS and uses non-traditional treatment. (*Id.*)

With respect to Siebert's degree of impairment, Standard found insufficient proof of any disabling cognitive impairment. (STND 0759). In addition, Standard found that Siebert's ability to work full-time after initially being diagnosed with CFS and FMS in 1993 to be inconsistent with the characterization of CFS as chronic debilitating fatigue. (STND 0760). Assuming Siebert was properly diagnosed with FMS, Standard found Siebert's ability to work after the initial diagnosis to be consistent with Standard's own view of FMS, that a majority of FMS patients are

able to perform light to sedentary work. (*Id.*)

Based on all of the information in Siebert's file, Standard concluded that Siebert was not entitled to LTD benefits because the more reasonable explanation for Siebert's inability to work was that it was caused or contributed to by a mental disorder, not a physical disease. (*Id.*)

## III.

## ANALYSIS

### A. THE STANDARD OF REVIEW FOR ERISA BENEFIT DETERMINATIONS

#### 1. The Language of the Plan

In reviewing the benefits decision of an ERISA fiduciary, the Court must first determine whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or to construe the terms of the plan." *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan does not confer such discretion, the Court reviews de novo any benefits decision by the administrator. *Id.* Where the administrator has discretion to determine benefits, however, the Court must utilize an abuse of discretion standard. *Id.* Under the abuse of discretion standard, the Court reviews the administrative record to determine whether substantial evidence supports the administrator's decision. *Clark v. Washington Teamsters Welfare Trust,* 8 F.3d 1429, 1432 (9th Cir.1993). If so, then the administrator's decision will be upheld, even though the record may contain evidence that could support a contrary conclusion. *Snow v. Standard Ins. Co.,* 87 F.3d 327, 332 (9th Cir.1996), *overruled on other grounds by Kearney v. Standard Ins. Co.,* 175 F.3d 1084 (9th Cir.1999)(en banc); *Taft v. Equitable Life Assur. Soc.,* 9 F.3d 1469, 1473 (9th Cir.1993); *Eley v.*

*Boeing Co.,* 945 F.2d 276, 279 (9th Cir. 1991); *Bolling v. Eli Lilly & Co.,* 990 F.2d 1028, 1029–30 (8th Cir.1993)("The [administrator] did not abuse its discretion merely because there was evidence before it that would have supported an opposite decision."); *Mizzell v. Paul Revere Life Ins. Co.,* 118 F.Supp.2d 1016, 1019–20 (C.D.Cal. 2000).

Where a plan administrator appears to have a conflict of interest, however, the Court must determine whether the conflict is sufficiently serious to require the Court to abandon the deferential standard of review. *See, e.g., Regula v. Delta Family–Care Disability Survivorship Plan,* 266 F.3d 1130, 1145 (9th Cir.2001); *McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1108 (9th Cir.2000); *Tremain v. Bell Indus., Inc.,* 196 F.3d 970, 976 (9th Cir.1999). An "apparent" conflict of interest exists when an ERISA Plan is both funded and administered by the insurer. *Regula,* 266 F.3d at 1145. "Standing alone, [however,] an apparent conflict of interest does not affect the *ultimate* standard of review." *McDaniel,* 203 F.3d at 1108 (emphasis in original). Rather, the Court must undertake an intermediate inquiry to determine whether the conflict of interest affected the decision. *Regula,* 266 F.3d at 1145. If the inquiry leads to the conclusion that the conflict of interest affected the administrator's decision, then an "actual" conflict is said to exist and the decision is reviewed de novo. *Tremain,* 196 F.3d at 975; *Friedrich v. Intel Corp.,* 181 F.3d 1105, 1109 (9th Cir.1999).

In this case, it is undisputed that the Policy provides Standard with discretionary authority to interpret its terms and make eligibility determinations. However, it is also undisputed that Standard funds benefit payments and administers the Policy, which raises the specter of a conflict of interest. If, after an examination of the

record, the Court determines that Standard acted in its own interest and in breach of its fiduciary duty to the plan participant, the de novo standard of review will be applied. Thus, the Court must first determine whether an actual conflict of interest existed.

### 2. The Standard for Determining an Actual Conflict of Interest

To determine whether a conflict of interest infected the administrator's decision-making, courts apply a burden-shifting scheme. *Regula,* 266 F.3d at 1145; *McDaniel,* 203 F.3d at 1108; *Friedrich,* 181 F.3d at 1109. Under this scheme, the plan beneficiary must provide "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1323 (9th Cir.1995) (setting forth the standard). If the beneficiary produces sufficient evidence, the burden then shifts to the plan administrator to produce evidence that the conflict of interest did not affect the benefits denial decision. *Lang v. Long–Term Disability Plan,* 125 F.3d 794, 798 (9th Cir.1997). If the administrator fails to carry its burden, the Court must review the benefits decision de novo, rather than for abuse of discretion. *Regula,* 266 F.3d at 1145; *Tremain,* 196 F.3d at 976.

What constitutes material, probative evidence of the fiduciary's self-interest generally must be determined on a case by case basis; however, case law identifies a number of factors relevant to this determination. First, a recent Ninth Circuit decision borrows the treating physician rule from Social Security disability jurisprudence and holds that, where an apparent conflict of interest has been established, an administrator's rejection of the treating physician's opinions constitutes material, probative evidence of an actual conflict of interest. *See Regula,* 266 F.3d at 1147 (holding that the treating physician rule of Social Security law is applicable in ERISA benefit cases). Other factors identified in the case law as evidence of an actual conflict of interest include the following:

(1) An administrator's statement of inconsistent reasons for denying benefits, or other inconsistent behavior in dealing with the beneficiary. *Regula,* 266 F.3d at 1146 (*citing Lang,* 125 F.3d at 799).

(2) An administrator's change in position without receipt of any new evidence. *Id.* (*citing Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1569 (11th Cir. 1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991)).

(3) An administrator's reliance on an improper definition of disability under the plan. *Id.* (*citing Tremain,* 196 F.3d at 977).

(4) An administrator's determination of a material fact for which it has provided no supporting evidence. *Id.*

(5) An administrator's failure to provide reasons for its denial of benefits. *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 689 (7th Cir.1992).

(6) An administrator's failure to provide sufficient notice of the denial of the claim. *Friedrich,* 181 F.3d at 1110.

(7) Whether the record, taken as a whole, reflects that the administrator acted "as an adversary 'bent on denying [the beneficiary's] claim' and 'oblivious to her fiduciary obligations as administrator of the LTD Plan.'" *Id.*

### 3. Siebert Has Not Established an Actual Conflict of Interest

Siebert argues that the record in this case demonstrates the presence of a num-

ber of the above-referenced factors, and contends that the de novo standard should be applied. Specifically, Siebert offers the following evidence as proof that Standard's decision to terminate her benefits was tainted by self-interest: (1) Standard violated the treating physician rule; (2) Standard offered inconsistent reasons for denying Siebert's claim; (3) Standard waited six months, after approving Siebert's claim, before telling her that it was considering applying a mental disorder limitation to her claim; (4) Standard relied on improper definitions of disability while reviewing Siebert's claim; and (5) Standard based its final decision on evidence that it did not provide Siebert.[6] The Court addresses each of these arguments below.

### a. Standard Did Not Violate the Treating Physician Rule

Under the treating physician rule, "[a] treating physician's medical opinion as to the nature and severity of an individual's impairment must be given controlling weight if that opinion is well-supported and not inconsistent with the other substantial evidence in the case record." *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir.2001). The rationale behind this rule is that the treating physician has more of an opportunity than an examining or reviewing physician to observe the claimant and familiarize himself with the claimant's condition. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989); *Win-*

*ans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987). Although a treating physician's opinions are entitled to "greater weight," such opinions are not determinative, and the administrator need not accept conclusory assertions. *Magallanes*, 881 F.2d at 751. However, the treating physician's opinion may be disregarded only if the administrator produces specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Monroe v. Pacific Telesis Group Comprehensive Disability Benefits Plan*, 971 F.Supp. 1310, 1315 (C.D.Cal.1997). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir.1992)(*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

In this case, the undisputed facts show that Standard rejected the treating physicians' diagnoses of CFS and FMS. Thus, the burden shifts to Standard to provide specific, legitimate reasons, based on substantial evidence in the record, for its decision to disregard Siebert's treating physicians' opinions. Standard claims it justifiably disregarded the opinions of the treating physicians for a number of legitimate reasons. The Court examines these reasons below.

### i. CFS Diagnosis

Siebert's treating physicians concluded that she was suffering from CFS, a diag-

---

**6.** Siebert also raises an argument regarding judicial estoppel. Siebert claims that because Standard helped her obtain a reversal of the initial Social Security determination that she was not disabled, and because Standard benefitted financially from the Social Security proceedings, Standard should be estopped from now claiming that she is not disabled. This argument fails because Standard is not taking inconsistent positions. Under the Social Security Act, a person can receive benefits for a

disability caused by a mental disorder. Under the Policy, however, a beneficiary can receive benefits for only two years if her disability is caused or contributed to by a mental disorder. Thus, Standard is not estopped from arguing that Siebert is not disabled under the terms of the Policy (i.e., that Siebert is not totally disabled due to a physical disease) because Standard supported the Social Security determination on the basis that Siebert was totally disabled due to a mental disorder.

nosis that Standard rejected. Standard lists the following seven factors it considered before it disregarded the diagnosis:

(1) Dr. Goldberg's reliance on case definitions for CFS from the CDC was misplaced because the CDC itself stated that the criteria was intended for research, rather than diagnostic, purposes (STND 0044–47, 0564, 0753, 0783);

(2) Dr. Goldberg's reliance on an abnormal SPECT scan was misplaced as abnormal SPECT scans can be found in individuals without any disease process being apparent (STND 0766–70);

(3) Siebert's medical records did not indicate that the systemic psychosocial history and mental state examination suggested by the CFS Consensus Report was conducted (STND 0784);

(4) Psychological testing conducted by Dr. Hochman revealed that Siebert was moderately to severely depressed and that, although she attempted to conceal her depression, it surfaced through somatic expression (STND 0526, 0536);

(5) Dr. Goldberg's report of Siebert's cognitive impairment was contradicted by Dr. Hochman's neuropsychological testing that demonstrated a very high IQ and no deficit of memory or concentration (STND 0556);

(6) A concurrence with the determination by the Social Security Administration that Siebert suffered from a somatoform disorder (STND 0369–71); and

(7) Siebert continued to work in her own occupation for 40 or more hours per week for four years after she was first diagnosed with CFS (STND 0705, 0510).

(Defendant's Reply at 8).

Siebert claims that Standard's proffered reasons for disregarding her treating physicians' CFS diagnosis are not legitimate. Although Siebert acknowledges that meeting the CFS criteria alone is not evidence that she is disabled by CFS, she argues that Dr. Goldberg did not diagnose Siebert with CFS based solely upon the CFS criteria. In support of her argument, Siebert cites to Dr. Goldberg's medical report, which states:

Ms. Siebert still has unexplained persistent fatigue classifiable as chronic fatigue syndrome as per the '1994' guidelines Section I. Ms. Siebert has unexplained persistent chronic fatigue that is of new or definite onset (has not been life long); is not the result of ongoing exertion; is not substantially alleviated by rest; and results in substantial reduction in previous levels of occupational, educational, social or personal activities.

In addition, Ms. Siebert has the following symptoms that meet this criteria...(1) impaired memory and concentration, (2) sore throat, (3) tender cervical and axillary lymph nodes, (4) muscle pain, (5) multi-joint pain, (6) new headaches, (7) unrefreshing sleep, (8) post-exertion malaise.

(STND 0044). Dr. Goldberg's statements, however, merely rephrases the CFS criteria (*see supra* n. 5). Additionally, Siebert claims that Dr. Goldberg's diagnosis of CFS is supported by objective findings such as abnormal blood and urine tests, an abnormal EBV–IgG (Epstein Barr) test and abnormal SPECT scan.[7] (STND 629–

---

7. Standard objects to the introduction of this evidence because Siebert introduced results of laboratory reports, without providing a medical interpretation of the results. However, these documents were part of the Administrative Record, and were relied upon by Dr. Goldberg when he made his diagnoses. Pre-

670). Although the SPECT scan and an abnormal laboratory findings alone do not establish CFS, Siebert argues that they do establish abnormal brain-patterns and internal bodily functions. Siebert also relies on *Friedrich v. Intel Corp.*, 181 F.3d 1105 (9th Cir.1999), where the court found that objective tests, such as SPECT scans and Epstein Barr tests, were a characteristic finding in patients with CFS. Standard, however, urges the Court not to rely on judicial opinions that state scientific or medical propositions as precedent. The Court finds Standard's argument persuasive. The substantial evidence in the record indicates that CFS cannot be verified by diagnostic physical findings or laboratory tests. (*See, e.g.,* STND 0751–52).

In addition, Dr. Hochman's finding that Siebert's mental status did not disable her should not have misled Siebert into believing that a systemic psychosocial history and mental state examination was not necessary. Siebert claims that she believed Dr. Hochman's findings meant that a psychiatric illness had already been ruled out by Standard. Siebert, however, seems to misunderstand Dr. Hochman's findings. Dr. Siebert's conclusion that Siebert is not *disabled* by a mental disorder is not the same as finding that Siebert's condition is not *caused*, at least in part, by a mental disorder. After conducting a face-to-face interview and reviewing · Siebert's medical records, Dr. Hochman found Siebert's reported limitations "unreasonable" because his testing showed no deficit in Siebert's concentration and memory, and therefore he concluded that Siebert's physical complaints were most likely symptoms of depression. (STND 0526–27). Dr. Hochman's opinion was also supported by Siebert's prior work history, which indicates that Siebert

continued to work full-time for over four years after being first diagnosed with CFS.

Based on these reasons, the Court concludes that Standard provided a sufficient justification for disregarding Dr. Goldberg's CFS diagnosis, which is supported by substantial evidence in the record.

### ii. FMS Diagnosis

Standard lists the following six factors it considered before it rejected the diagnosis made by Siebert's treating physicians regarding FMS:

(1) Dr. Goldberg's medical records did not provide the requisite three-month history of reports of widespread pain, one of the ACR criteria for diagnosis of FMS (STND 0607–77);

(2) Drs. Cole and Goldberg indicated to the Social Security Administration that neither had performed a "trigger" point examination (STND 0185, 0278);

(3) Dr. Goldberg is not qualified to diagnose FMS, as he is a pediatrician rather than a rheumatologist (STND 0788);

(4) Dr. Fraback, who is a consultant physician board-certified in rheumatology, concluded that the criteria for diagnosing FMS were not adequately documented by Siebert's treating physicians (STND 0303, 830);

(5) Dr. Fraback's conclusion that the only diagnosis that seemed to have reasonable support in Siebert's file was depression and a possible soma-

---

sumably, Standard's physician consultants were able to interpret these results, and if they were unable to do so, then Standard

should have requested a proper medical interpretation of these results from Dr. Goldberg.

toform disorder (STND 0302–03, 0831);

(6) Dr. Fraback's conclusion that Dr. Goldberg's treatment was nontraditional and lacked a medical rationale (STND 0302–03); and

(7) The fact that most FMS patients "are capable of work...[and] only a minority of patients are unable to work," as evidence by the fact that Siebert was able to continue full-time work at her own occupation for four years after the initial diagnosis of FMS in 1993 (STND 0705, 0510, 0757–58, 0834).

Siebert, however, contends that Standard should not have disregarded her treating physicians' FMS diagnosis based upon these reasons. Siebert argues that Standard's reliance on Dr. Fancher's expertise to reject Dr. Goldberg's opinion was improper because Dr. Fancher did not examine Siebert and therefore could not provide a comprehensive assessment of her physical condition. Although Dr. Fancher was not in a position to determine whether Siebert actually satisfied the "trigger" point examination, Dr. Fancher was qualified to determine whether Siebert's medical records indicated a history of widespread pain and whether Drs. Cole and Goldberg had performed and documented a "trigger" point examination. Based on his expertise, Dr. Fancher concluded that Siebert might have FMS, but he could not find adequate documentation of this diagnosis. (STND 0303).

Furthermore, Standard also concluded that even if Siebert did have FMS, she was not totally disabled by FMS. Although Dr. Goldberg concluded that Siebert was not capable of continuous, sustained, full-time work, he did not provide any explanation or support for his opinion. (STND 0047). In contrast, as discussed above, Dr. Hochman's independent medical examination and review of Siebert's prior work history supported Standard's conclusion that Siebert was not functionally disabled from "any occupation," as defined by the Policy.

Thus, the Court concludes that Standard provided specific, legitimate reasons, supported by substantial evidence in the record, for disregarding Dr. Goldberg's FMS diagnosis. Accordingly, the Court concludes Standard did not violate the treating physician rule.

### b. Standard's Position Throughout the Claim Was Consistent

Siebert argues that Standard's initial and final denial letters demonstrate that Standard repeatedly changed its reasons for terminating her claim. According to the Ninth Circuit, such inconsistencies may constitute material, probative evidence that the administrator's decision was tainted by self-interest. *See Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech.*, 125 F.3d 794, 799 (9th Cir.1997). In *Lang*, the administrator first terminated the plaintiff's benefits because it claimed the plaintiff did not have FMS. *Id.* On appeal, the plaintiff produced ample evidence that she did suffer from the disease. *Id.* The administrator then required the plaintiff to show that the FMS "in and of itself" was disabling and rejected the plaintiff's claim on the additional ground that, regardless of the cause of the disability, whether a person had a "mental disorder" is determined by symptoms and not causes. *Id.* The Ninth Circuit found that the administrator's inconsistent reasons for its refusal to lift the "mental disorder" limitation constituted material, probative evidence that its decision was affected by self-interest.

In this case, however, the Court does not find such inconsistencies in Standard's initial and final denial letters. In the January 2000 letter, Standard explained that it was terminating Siebert's benefits for

two reasons: (1) Siebert's disability was caused or contributed to by a mental disorder; and (2) Siebert did not provide sufficient proof that a physical illness, such as FMS, caused her to become "disabled" under the "all occupation" definition. (STND 0102–05). This initial letter stated that Siebert's CFS symptoms were most likely caused by a mental, as opposed to a physical, disorder. The letter also stated that Siebert might have FMS, but that FMS would not prevent her from performing work in the sedentary to light strength factor range. In the final determination letter dated June 4, 2001, Standard reiterated these same reasons for terminating Siebert's benefits, and provided a more in-depth explanation for its conclusions. Thus, the Court finds no inconsistency in these explanations.

### c. Standard Timely Notified Siebert of the Mental Disorder Limitation

Siebert argues that Standard kept the fact that it was considering applying the mental disorder limitation to her claim a secret for six months, until finally revealing this intention in the March 25, 1998 letter. In addition, Siebert argues that the letter did not adequately explain why Standard was considering applying the limitation to her claim. Siebert claims this is material, probative evidence of a conflict of interest. This evidence, however, is neither material nor probative. Standard notified Siebert one and one-half years before the mental condition limitation could be applied. Additionally, in the March 25, 1998 letter, Standard explained to Siebert that information in her file indicated that her condition was caused or contributed to by a mental disorder and that Standard was currently conducting an investigation to determine the applicability of the limitation to her claim. Standard is only required to provide a claimant with an adequate explanation when it denies a claim. See C.F.R. § 2560.503–1(e)(1) & (f).

Here, Standard's letter to Siebert was simply a notice that it may, in the future, terminate her claim.

### d. Standard's Use of Improper Definitions of Disability Does Not Evidence an Actual Conflict of Interest

Siebert argues that she was misled as to how her claim was being reviewed because Defendant's two internal medical reviewers, Drs. Fancher and Fraback, and the claim supervisor, Laurie Bayley, all used incorrect definitions of disability during the time Siebert's claim was being evaluated. Standard, however, argues that it properly administered Siebert's claim because it applied the proper definition of disability in its initial and final determination letters to Siebert. Standard also notes that Siebert never raised this issue during her appeal, which tends to show that she was never actually "misled" by these definitions. Furthermore, Standard argues that even if the Court considers Standard's reliance on an improper definition of disability as material, probative evidence of self-interest, Standard would easily rebut this presumption because it corrected its mistake, without any prompting from Siebert. The Court finds Standard's argument persuasive. The fact that Standard unilaterally corrected the mistake demonstrates that Standard was not acting under a conflict of interest.

### e. Standard Did Not Improperly Rely on Information

Siebert next argues that, in issuing its final determination, Standard relied on documents that were not provided to her until six days before the cross-motions for summary judgment were to be filed. Siebert objects to Standard's inclusion of these documents in the Administrative Record and claims that this demonstrates

a conflict of interest. Standard, however, argues that it does not have a legal obligation to produce all records compiled during the claim review process to Siebert. Additionally, Standard states that these documents were part of the review process and in fact, they were specifically referenced in Standard's final determination letter. Because these documents were referenced in the June 4, 2001 letter, they should be included in the Administrative Record. Siebert clearly had notice that these documents existed; yet, she does not provide the Court with any evidence that she timely requested and was refused copies of these documents. While the Court believes that Standard should have made early disclosure of these documents without a request pursuant to Rule 26(a) of the Federal Rules of Civil Procedure, the Court concludes that the delay in production of these materials does not constitute material, probative evidence of a conflict of interest.

### B. STANDARD DID NOT ABUSE ITS DISCRETION

■ Having determined that Standard's decision was not infected by a conflict of interest, the Court must now determine if Standard abused its discretion by terminating Siebert's disability claim. Under Ninth Circuit case law, the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply here. *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999). Rather, as the abuse of discretion standard applies, the parties' cross-motions for summary judgment are the conduit to bring the legal question before the Court. *Id.*

Under the abuse of discretion standard, a decision by an ERISA administrator "will not be disturbed if reasonable." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1123 (9th

Cir.1998). Generally, ERISA plan administrators abuse their discretion if they render decisions without any explanation, or in a way that conflicts with the plain language of the Plan, or that are based on clearly erroneous findings of fact. *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1323–24 (9th Cir.1995). Similarly, decisions that are arbitrary and capricious, that are made in bad faith, that are not supported by substantial evidence, or that are erroneous as a matter of law, also constitute an abuse of discretion. *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 536 (9th Cir.1990).

When reviewing an administrator's decision for abuse of discretion, the Court may not "substitute its judgment for that of the administrator unless the latter's decision was clearly erroneous in light of the available record." *Voight v. Metropolitan Life Ins. Co.*, 28 F.Supp.2d 569, 579 (C.D.Cal. 1998). Thus, the issue before the Court is not whether Standard's decision was correct, but whether substantial evidence in the record supports its decision. *Clark v. Washington Teamsters Welfare Trust,* 8 F.3d 1429, 1432 (9th Cir.1993)("Our inquiry is not into whose interpretation of plan documents is most persuasive, but whether the plan administrator's interpretation is unreasonable."). The Ninth Circuit has defined "substantial evidence" as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).

Under this very deferential standard, the Court finds that Standard did not abuse its discretion. As discussed more fully above, Standard provided specific, legitimate reasons, based on substantial evidence, for disregarding the opinions of Siebert's treating physicians. Although contradictory evidence in the record ex-

ists, the Court finds that, as a matter of law, such Standard did not abuse its discretion by concluding that Siebert was not disabled under the terms of the Policy. *See Taft v. Equitable Life Assurance Soc'y,* 9 F.3d 1469, 1473 (9th Cir.1993)(stating that "[i]n the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion."). Moreover, Standard provided Siebert with an in-depth explanation for its decision on two separate occasions. For these reasons, the Court finds that Standard's decision to terminate Siebert's benefits was not made arbitrarily or capriciously and was not premised on clearly erroneous findings of fact or conclusions of law.

## IV.

### CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary Judgment, and **DENIES** Plaintiff's Motion for Summary Judgment.

IT IS SO ORDERED.