### Donald GAINES, Plaintiff,

v.

### THE SARGENT FLETCHER, INC. GROUP LIFE INSURANCE PLAN; the Hartford Life Insurance Company Defendant.

### No. CV 03–2083 GAF(VBKX).

United States District Court, C.D. California.

July 30, 2004.

Gruber & Kantor, By Glenn R. Kantor, Esq., Corinne Chandler, Esq., Sherman Oaks, CA, for the Plaintiff.

Bannan, Green, Frank & Terzian, LLP, By Lesley C. Green, Esq., Los Angeles, CA, for Defendant Hartford Life and the Sargent Fletcher Long–Term Disability Plan.

Reish, Luftman, Reicher & Cohen, By Joseph C. Faucher, Esq., Los Angeles, CA, for Defendant Sargent Fletcher, Incorporated.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FEESS, District Judge.

## I.

## INTRODUCTION

This case presents a dispute concerning a $150,000 life insurance policy purchased

by Plaintiff, Donald Gaines, for his wife Velda, through a benefit plan offered by his employer, Sargent Fletcher, Inc. When Velda died Sargent Fletcher, Inc. Group Life Insurance Plan and the insurance company that issued the policy, Defendant Hartford Life Insurance Company, refused to pay more than $20,000 because Gaines had not provided the insurer with information regarding his wife's health that was supposedly required to purchase the additional $130,000 in coverage. The Plan and Hartford have persisted in refusing to honor Gaines's claim even though Gaines filled out the forms provided to him by his employer and paid monthly premiums on the $150,000 policy until his wife died. Sargent Fletcher deducted these premiums from his paycheck, and forwarded them to Hartford, which accepted the payments without comment, and said nothing about the allegedly missing information until Gaines made his claim.

What the Court finds most noteworthy is that Defendants take this position in the face of the concession by the Sargent Fletcher Human Resources Manager that she was unaware of the requirements being asserted as a defense to Gaines's claim, and that no Sargent Fletcher employees had been advised of the need to supply the information that Gaines had failed to provide. Thus, despite a clear record establishing that Plaintiff did everything asked of him, and that his failure to provide information regarding his wife's health was entirely the fault of Defendants, Defendants insist that Plaintiff should bear the consequences of their failure. As a result, Plaintiff seeks relief from this Court in this lawsuit seeking recovery of benefits under Employee Retirement Income Security Act ("ERISA") section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

Defendants now separately and together move for summary judgment. Defendants attempt to make this case appear complex and unmanageable both on the facts and the law, needlessly complicating what is a relatively straightforward dispute. In essence, Defendants maintain that, though the outcome may be unfortunate, the Court should hold that Plaintiff is not entitled to the requested benefits because the Plan language clearly requires that Plaintiff submit evidence of good health in the form of a personal health statement and that the requirement was not met in this case. If the Court disagrees, Hartford seeks a second bite at the apple, requesting that the matter be remanded to it for a final determination on Plaintiff's claim.[1]

Plaintiff's opposition, which the Court construes as also being a cross motion for summary judgment, seeks a determination that the decision of Sargent Fletcher and Hartford should be reviewed *de novo*, and that such review will reveal that the Plan language requiring the submission of "evidence of good health" is ambiguous.[2] Ac-

---

1. Although explicitly pleaded in the complaint, neither of Defendants' motions address the doctrines of waiver or reasonable expectations. Plaintiff contends that Defendants, employing strategic gamesmanship, purposefully neglected to address these doctrines in their motions, delaying any discussion until they could file their respective reply papers in order to deprive Plaintiff the opportunity to respond to their arguments. Accordingly, Plaintiff requests that the Court refuse to consider Defendants' belated arguments on these

theories. Nonetheless, the Court has considered all of the parties' arguments.

2. The Court construes Plaintiff's opposition as a cross motion for summary judgment because it is filed concurrently with and served upon Defendants with a proposed order "denying Defendants' motions for summary judgment and entering summary judgment on certain issues in favor of Plaintiff." Moreover, a district court may "sua sponte grant summary judgment to the non-moving party" as long as the moving party was provided a "full and

cordingly, Plaintiff contends that the Plan should be construed to require evidence of good health only upon request by the plan administrators, and that their failure to request it from him in this case precludes them from asserting the requirement as a barrier to his claim. Plaintiff contends that such a construction is necessary to protect his reasonable expectations as required by ERISA jurisprudence, and that under such construction Defendants should therefore be: (1) estopped from invoking the Plan's evidence of good health requirement; and (2) deemed to have waived the requirement.

Having reviewed the parties' submissions and heard argument regarding the applicable facts and law, the Court concludes that the fundamental issue presented is whether a participant in an ERISA benefit plan can be denied benefits under a life insurance policy for failing to comply with an undisclosed condition when he has otherwise complied with all directions of the Plan Administrator, properly applied for the benefit and paid the premiums on the policy up until the time a claim was submitted. In other words, the Court must determine whether the defendant-fiduciaries may shift to a plan beneficiary the harm resulting from their own failure to properly advise the beneficiary of the conditions necessary to obtain plan benefits, even when the fiduciaries are in a position of superior knowledge. The

Court concludes that when, as is the case here, ERISA fiduciaries breach their respective duties to a beneficiary and render decisions inconsistent with the reasonable expectations of that insured, the answer is unequivocally no.

Accordingly, for the reasons discussed in greater detail below, Defendants' motions for summary judgment are **DENIED**. In addition, Plaintiff's cross motion for summary judgment on the issues of the applicable standard of review, the reasonable expectations of the insured, estoppel, and waiver is **GRANTED**. Furthermore, Defendants' request that this matter be remanded to Hartford is **DENIED**.

## II.

### STATEMENT OF UNDISPUTED FACTS

As of November 2000, Sargent Fletcher sponsored a group life and disability insurance plan ("the Plan") for the benefit of its employees funded by and issued through Hartford Insurance. (Alvarado Decl. ¶ 2).[3] One of the benefits provided by the Plan was that insured employees would be eligible to obtain coverage for their dependents. Although Sargent Fletcher is the named Plan Administrator and the Plan is described as "self administered," Sargent Fletcher carried out limited administrative duties, and the actual administration of claims was performed by Hartford.[4] Sar-

---

fair opportunity to ventilate the issues in the motion." *United States v. Real Property Located at 25445 via Dona Christa, Valencia, California,* 138 F.3d 403, 407 n. 4 (9th Cir. 1998) (quoting *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311 (9th Cir.1982)); *see also Kassbaum v. Steppenwolf Prods., Inc.,* 236 F.3d 487, 494 (9th Cir.2000) ("It is generally recognized that a court has the power to grant summary judgment to a non-movant when there has been a motion but no cross motion."). Movants have had such an opportunity.

**3.** Prior to November 1, 2000, the Plan was funded by a policy issued through Canada Life Insurance Company. (Alvarado Decl. ¶ 2). The Canada Life policy apparently had no evidence of good health requirement.

**4.** "Self-administered" is defined by Sargent Fletcher as meaning that "the employer is responsible for making any employee or benefit changes to the bill (i.e. adding new employees, deleting terminated employees, adjusting for salary changes, etc.)." (Chandler Decl. Exh. A12 at 0062). Hartford admitted in oral

gent Fletcher was given an administrative kit to assist it in carrying out its limited Plan Administrator duties. (SPD ¶ 6; SGI ¶ 38).

### A. Plaintiff is Hired, Receives the Enrollment Packet, and Becomes Eligible for Enrollment in the Plan

Plaintiff was hired as an employee of Sargent Fletcher in June 2001 and became eligible to participate in the Plan ninety days later. (SGI to Hartford Motion ¶ 3). At the time of his hire, Plaintiff was given an enrollment packet for the Sargent Fletcher Life Insurance Plan. (*Id.* ¶ 19; Alvarado Depo. at 0018: 21–22). The enrollment packet contained three items: (1) a brochure describing the various employee life and disability, as well as supplemental life and supplemental dependent life, insurance options, (2) the Plan itself,[5] and (3) a "Life/Disability Enrollment Form." (Chandler Decl. Exh. A Alvarado Depo. at 0039:2–4; 0007–8:19–06) (hereinafter "Alvarado Depo."). Ms. Alvarado, Human Resources Manager of Sargent Fletcher, testified in her deposition that she believed (incorrectly as the evidence reveals) that the enrollment packet contained all that was required. None of the documents in the enrollment packet—including the Plan itself—referred to a "personal health statement."

### 1. The Brochure

The brochure contained the following language: In the line labeled "Spouse Benefit," the brochure read: "$10,000 Increments up to $150,000, but not more than 50% of your own coverage approved by Hartford Life." (Chandler Decl. Exh. 10). In the line labeled "Spousal Guarantee Issue Amount," the brochure read: "Spouse

coverage may be elected up to $20,000 without answering any medical questions." (*Id.*). Noticeably absent from the brochure is any mention of a requirement of "evidence of good health" or a "personal health statement." (Alvarado Depo. at 0018:12–15). Moreover, the implicit message of the brochure is that if any medical information is required, an inquiry would be made by Hartford or Sargent Fletcher.

### 2. The Plan and the Pertinent Plan Provisions

Under the subheading "How do You enroll?" employees are instructed that to enroll they must complete *and sign* a satisfactory enrollment form; and deliver it to the employer. (Plan attached to S.F.'s Mot. at 25) (hereinafter "Plan"). Under the "Eligibility and Enrollment" subheading, an employee is given the following directions:

**When does coverage for Your Dependent(s) Start?**

You are required to enroll for contributory Dependent coverage. To do so, You have to complete and sign a group insurance enrollment form acceptable to Us and deliver it to the Employer. Your spouse will become insured for coverage for which we do not require Evidence of Good Health on the first to occur of:

1. the date You are eligible for Dependent Coverage, if You enroll or have enrolled for spousal coverage by then; or

2. The date You enroll for Dependent Coverage, if You do so within 31 days after the date You are eligible. If you enroll for Dependent Coverage more than 31 days after You are first eligible

---

argument that it is the actual "claim administrator."

**5.** The final pages of the Plan contain the summary plan description ("SPD") mandated by ERISA. (Chandler Decl. Exh. 24A).

to do so, no coverage will be available without Evidence of Good Health. Coverage for which we require Evidence of Good Health will be effective on the later of:

1. **The date You become eligible; or**
2. **The date approved by Us.**

. . . . .

If you enroll for Dependent Coverage more than 31 days after You are first eligible to do so, no coverage will be available without Evidence of Good Health.

Coverage for which We require Evidence of Good Health will be effective once *approved by Us.*

(Plan at 26) (emphasis added).

Although certain language in the Plan suggests that Evidence of Good Health is required under certain circumstances, *e.g.,* if the amount of coverage exceeds the "Guarantee Issue Amount" (Plan at 22), other language creates confusion and ambiguity on that subject. Thus, it states that a Plan participant is eligible for dependent coverage if enrollment occurs within 31 days of eligibility, while enrollment at a later date would require "Evidence of Good Health." Thus, the Plan does not make clear how this term is to be construed with other language suggesting that the maximum amount of life insurance coverage for dependent spouses for which evidence of good health is not required is $20,000—the "Guarantee Issue Amount." (Plan at 24). More problematic, however, is the ambiguity in the Plan regarding the meaning of the phrase "Evidence of Good Health."

The Plan defines the term in somewhat circular fashion by stating, "Evidence of Good Health" is "information about a person's health from which We can determine if coverage or increases in coverage will be effective." (Plan at 22). "Information

*may* include questionnaires, physical exams, *or* written documentation as *required by Us.*" (*Id.*) (emphasis added). Immediately following this definition, the provision goes on to say that "[i]nquiries as to the status of your submission of evidence of good health should be addressed to your employer and/or benefit administrator. (*Id.*). Your employer and/or benefit administrator will notify you of approvals. (*Id.*). *We will notify you, in writing, of any disapprovals.*" (*Id.*) (emphasis added). As discussed in more detail below, the words "may," "or" and "required by us"—when read in context of the undertaking of the insurance company to give notice when an application for benefits has been disapproved—defeat the claim that a beneficiary's obligation to provide evidence of good health is clear and unambiguous.

### 3. The Life Disability Enrollment and Benefit Election Forms

The Life/Disability Enrollment Form contained in the enrollment packet did not advise applicants that "evidence of good health" or a personal health statement were required to obtain certain Plan coverage. (*See* Chandler Decl. Exh. A at SF100004). In October 2001, when Plaintiff became eligible for enrollment in the Plan, he was told to complete a Benefit Confirmation Election Form. (SGI to Hartford's Mot. ¶ 11; Chandler Decl. Exh. A at SF 100037). That form also neglected to advise Plaintiff that he needed to complete a personal health statement or provide any other evidence of good health at the time of enrollment. (*See* Chandler Decl. Exh. A at SF 100038).

### B. Plaintiff Enrolls in the Plan's Supplemental Dependent Life Insurance Program

In the Benefit Election Form, Plaintiff elected supplemental life insurance coverage in the amount of $150,000 for his wife,

Velda Gaines. (*Id.*). He filled out the form based solely on input he received in the enrollment packet given to him by Sargent Fletcher's Human Resources Department and an open enrollment presentation conducted by a third party hired by Sargent Fletcher. (Chandler Decl. Exh. A at 0049:1–12, 0051–0052 (stating that employees were given the enrollment packet and told to direct questions to Sargent Fletcher Human Resources Department and that the open enrollment was attended by all employees)). No one in the Sargent Fletcher Human Resources Department advised Plaintiff that in order to successfully enroll in the Plan and to obtain the coverage he sought that he was required to provide Hartford with any "evidence of good health" or a "personal health statement." (*Id.* at 0003–0005). Nor was that requirement mentioned at the open enrollment presentation. (*Id.* at 0052:12–21).

After completing the form, Plaintiff was instructed to give it to Nancy Short an assistant to Ms. Alvarado—for processing. In the interest of efficiency, Ms. Short filled out the actual Life/Disability Enrollment Form for employees, including Plaintiff. (Alvarado Depo. at 0020–21). Plaintiff was not asked to sign the election or enrollment forms because that responsibility was to be undertaken by Ms. Short. (*Id.*). Because Ms. Short filled out the actual enrollment form and sent it to Hartford before obtaining Plaintiff's signature, the form is unsigned. (*Id.*). Though the Plan requires that an application be signed, the application was never rejected

on this ground.[6] (*See* Chandler Decl. Exh. at SF 100020)

### C. Deduction and Acceptance of Premium Payments and the Employee List

After the enrollment form was sent to Hartford, Plaintiff received no notice of deficiency of his application. To the contrary, Sargent Fletcher began deducting premium payments from Plaintiff's paycheck in the full amount required to pay for the supplemental dependent life insurance he enrolled in for his wife ($27.00 per month). (*Id.* at 0010:11–12; Chandler Decl. Exh. A SF 100038). Ms. Alvarado testified that along with the premium payments, each month, Sargent Fletcher sent a list of employees who had elected coverage to Hartford. (*Id.* at 0054; Chandler Decl. Exhs. A31 & B). The employee list identified the employee, the type of coverage purchased, and the amount of monthly premium payments paid by the employee. (Alvarado Depo. at 0054). Plaintiff was on the list and was identified as having purchased $150,000 in supplemental dependant life insurance. (*Id.*). Thus, the list indicates the coverage Plaintiff now maintains he obtained.

Hartford, in turn, accepted these monthly payments for five months and never advised Sargent Fletcher or Plaintiff that his application was incomplete, that coverage had been denied, or otherwise gave any indication to Plaintiff or Sargent Fletcher that Plaintiff or any other employee was not covered. (Transcript at 9–10). In particular, Plaintiff was not notified in writing, or otherwise, that his application for enrollment was disapproved for

---

6. Notably, Defendants do not now contend, nor did they ever contend that coverage should be denied in its entirety because the form is unsigned. Although Defendants mention this fact in their respective motions, they advance no persuasive argument regarding this deficiency. Indeed, they concede that they cannot now argue that Plaintiff is entire-

ly deprived of coverage. Defendant Hartford paid Plaintiff $20,000, the "Guarantee Issue Amount," which constitutes a waiver of the signature requirement and an admission that Plaintiff is entitled to some form of supplemental dependent life insurance coverage whether the enrollment form was signed or not. (Chandler Decl. Exh. 18).

any reason, including the failure to supply a personal health statement. (*Id.*). To the contrary, in December 2002, Plaintiff was sent a benefits confirmation report by Sargent Fletcher. (Chandler Decl. Exh. A19 ("This statement is a brief outline of your company benefits as of December 10, 2002. It is out [sic] way of showing you how much we appreciate your contribution to the success of SFI.")). The benefit statement indicated his dependent supplemental life coverage in the amount of $150,000, the total annual cost for the coverage, and his total contribution ($162.00) for the year. (*Id.*).

## D. PLAINTIFF SUBMITS A CLAIM AND HARTFORD DENIES COVERAGE

In March 2002, after five months of premium payment deductions by Sargent Fletcher and acceptances of those premiums without notice of deficiency by Hartford, Plaintiff's wife died unexpectedly of a brain embolism. (Compl.¶ 7). In April 2002, Plaintiff submitted a claim to Hartford. (SGI attached to Opp. to Hartford Mot. ¶ 14). Attached to the claim for benefits was the death certificate for Velda Gaines which indicated that she died of atherosclerotic cardiovascular disease. (SGI attached to Opp. to Hartford Mot. ¶ 14). Sargent Fletcher, the Plan Administrator, advised both Plaintiff and Hartford that all of the benefits he was claiming in the amount of $150,000 were due to be paid. (Alvarado Depo. at 0025:18–24 (stating that she believed and communicated her belief that Plaintiff had successfully enrolled and was entitled to the full benefits)); (Exh. No. 16 to Alvarado Depo. (showing that Ms. Alvarado signed the employer certificate on the claim form attesting that Plaintiff had enrolled in the program for $150,000 in coverage)).

Hartford did in fact pay a portion of the benefits—$20,000 (the "Guarantee Issue Amount") reflecting a payment of limited life insurance benefits—but declined to pay Plaintiff the remaining $130,000 in benefits Plaintiff now seeks in this lawsuit because he had not submitted "evidence of good health." (SGI to Opp. to Hartford Mot. ¶ 16; Chandler Decl. Exh. 18; Admin. Rec. to Hartford Mot. 0001). The letter partially denying Plaintiff's claim was the only notice Plaintiff received that he failed to successfully enroll in the Plan's Supplemental Life Insurance Program. The letter also notified Plaintiff of his right to appeal and the time in which he had to do so. (*Id.*). Rather than appealing, Plaintiff filed this action. The Plan has no requirement that he exhaust all appeals before initiating a lawsuit.

## E. THE REQUIREMENT OF THE COMPLETION OF A PERSONAL HEALTH STATEMENT

Unknown to Sargent Fletcher or Plaintiff, a "personal health statement" was apparently the "evidence of good health" required by Hartford. (Alvarado Depo. at 0003–0008). Despite Ms. Alvarado's position as human resources manager of Sargent Fletcher, she had no knowledge of any evidence of good health requirement in the Plan or that personal health statement forms had been provided by Hartford to Sargent Fletcher for distribution to employees. (*Id.*).

Ms. Alvarado admits that prior to Plaintiff's hiring, Sargent Fletcher received an "administrative kit" from Hartford, but she did not actually look at the kit until after she learned that Plaintiff's claim had been denied in March of 2002. (*Id.* 0003:2–15). After this controversy arose, she inspected the kit and discovered for the first time, a form titled "personal health statement." (*Id.*). Sargent Fletcher had neglected to distribute this form to any of its employees. (*Id.* at 0004:4–7). Accordingly, the personal health statement forms were not actually given to employ-

ees until after March of 2002, when Sargent Fletcher learned of Hartford's basis for denying Plaintiff Gaines's claim. (*Id.*). The apparent excuse for this error on the part of Sargent Fletcher is that none of the information customarily given to Sargent Fletcher and its employees in the past specified that a personal health statement was required to obtain spousal insurance in excess of $20,000. (*Id.* at 0018 lines 5–13).

In sum, **none** of the information given to Plaintiff specified that a personal health statement was required for enrollment in the Supplemental Life Insurance Program. Indeed, nowhere in the items contained in the enrollment packet do the words "personal health statement" appear, nor is there any indication that such a statement is required.[7] Similarly, the brochure and enrollment form did not advise the insured that "evidence of good health," in any form whatsoever, was a prerequisite for enrollment. All in all, the undisputed material facts show that there never was a document called a "personal health statement" or "evidence of good health" form provided to this Plaintiff or any other Sargent Fletcher employee either by Sargent Fletcher or Hartford.[8]

### F. LATER ACTIONS TAKEN BY SARGENT FLETCHER TO PERFECT EMPLOYEE COVERAGE

After Plaintiff's claim was denied, Ms. Alavarado complained to Hartford that it should take responsibility for not notifying employees that they had not obtained coverage due to their failure to provide the required evidence of good health in the form of a personal health statement. (Alvarado Depo. at 0028; Admin. Rec. at 0001, 0006; Chandler Decl. Exh. 17). Hartford disagreed. In addition, Ms. Alvarado attempted to convince Hartford to grant Plaintiff's claim in full in light of the fact that Sargent Fletcher failed to provide him with the correct forms. *Id.* Her attempt was unsuccessful. Sargent Fletcher also made efforts to re-enroll the other employees who had already paid for coverage since the inception of the Plan, but because they were not provided with the correct forms, failed to obtain coverage. Specifically, Ms. Alvarado asked Hartford to waive the personal health statement requirement until the forms could be completed and sent to Hartford. (Alvarado Depo. at 0030–35). Hartford declined to waive the requirement and advised Ms. Alvarado that it would take the position that there was no coverage until a personal health statement had been approved. (*Id.*).

### III.

### DISCUSSION

### A. SARGENT FLETCHER IS A PROPER DEFENDANT TO THIS ACTION

■ Before discussing the general standards of review and how they are applied

---

7. There are two booklets that describe the supplemental life insurance program that state that a personal health form is required for such insurance, but these booklets were not sent by Hartford to Sargent Fletcher until the December 2002 open enrollment—eight months after Mrs. Gaines passed away. (Chandler Decl. Exh. 25). Though never provided to Plaintiff, the booklets do demonstrate how simple it would have been to notify an insured of the exact requirements for enrollment in the Plan.

8. Only the Plan itself made any mention of "evidence of good health." However, as discussed more fully below, because the Plan provisions discussing "evidence of good health" were proffered with no explanation of what constituted evidence of good health or how the employee was to provide it, the material submitted to the Plaintiff and the instructions in the Plan were at best ambiguous and at worst actually misleading.

to the two named Defendants, the Court will address—for the final time—Sargent Fletcher's argument that it is not a proper party-defendant in this ERISA action, despite this Court's prior unequivocal ruling to the contrary. (*See* 10/22/03 Order). It maintains that such ERISA actions are only permitted against the Plan itself. Having now twice considered the cases cited by Defendant Sargent Fletcher in support of its position, the Court concludes that they are distinguishable from the situation presented in this case. The Court will briefly revisit its prior reasoning.

ERISA § 502 specifically provides for the maintenance of civil causes of action by participants and beneficiaries to challenge benefits claim denials by plan administrators. Specifically, § 502(a)(1)(B) provides participants and beneficiaries with standing to bring civil actions for recovery of benefits to which the participant or beneficiary is entitled under the terms of the plan, actions to enforce rights under a plan, and actions to clarify rights to future benefits under a plan. 29 U.S.C. § 1132(a)(1)(B). ERISA § 502(d) states that the plan may be sued as an entity. 29 U.S.C. § 1132(d).

Sargent Fletcher argues that ERISA § 502(a)(1)(B) permits suits to recover benefits only against the plan as an entity. While some earlier cases seemed to support this conclusion, e.g., *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323 (9th Cir. 1985); *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279 (9th Cir.1990), those cases held only that employers, who were not also plan administrators, could not be sued under ERISA. (*See* Order of 10/22/03). To

the extent that those cases, which dealt only with suits brought against employers who were not also administrators, contain broad language suggesting that even administrators cannot be sued under ERISA, more recent decisions from this and other circuits have rejected such an implication. *See Everhart v. Allmerica Fin. Life Ins. Co.*, 275 F.3d 751, 754 n. 6 (9th Cir.2001) (acknowledging in dicta that this circuit and others now recognize suits brought under 29 U.S.C. § 1132(a)(1)(B) against plan administrators, and stating that the third party insurer defendant may well have been a proper party defendant had it been acting as the plan administrator).[9] *Everhart* found support for its conclusion in *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1471 (9th Cir.1993) where the court concluded that "the beneficiary of an ERISA plan may bring a civil action against a plan administrator" to recover benefits under § 1132(a)(1)(B). *Taft*, 9 F.3d at 1471; *see also Layes v. Mead Corp.*, 132 F.3d 1246, 1249 (8th Cir.1998) (permitting suit under Section 1132(a)(1)(B) against the plan administrator, but not a non-administrator employer); *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997) (holding that "[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan"); *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir.1988) (holding that an employer is not a proper defendant in an action for benefits under ERISA unless it is "shown to control administration of the plan."). Thus, this Circuit and others have clearly acknowledged that plan administrators are proper parties to a suit under § 502(a)(1)(B).

9. While the *Everhart* court acknowledged that there are two lines of cases regarding who are proper defendants in § 502(a)(1)(B) actions, it refrained from deciding which line of cases more accurately stated the law because the plaintiff had already released all claims against the plan administrator. Therefore, the court was not required to reach the question of whether a plan administrator is a proper defendant in an ERISA action.

For these reasons, the Court concludes that Sargent Fletcher, the only named administrator in the Plan, is a proper party Defendant to this action, but not necessarily the only proper defendant. As noted in the statement of facts, Hartford also participated in the administration of the plan, having undertaken the sole responsibility for administering claims. Hartford was provided with a list of insureds and the face amounts of the policies and was the recipient of premium payments on a monthly basis from all insureds under the Sargent Fletcher benefits plan. It was Hartford that specifically rejected the claim in this case (even over the protest of Sargent Fletcher's Human Resources manager), and has led the fight to deny Plaintiff any recovery beyond the $20,000 "Guarantee Issue Amount." Accordingly, both parties have been properly named as defendants. How liability is to allocated between them with respect to the payment of the claim is a matter not addressed in this lawsuit.

### B. THE RELEVANT LAW REGARDING THE STANDARD OF REVIEW IN ERISA ACTIONS FOR RECOVERY OF BENEFITS

#### 1. The Standards of Review

■ In reviewing an ERISA fiduciary's decision, the Court must first determine whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine the eligibility benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the administrator or fiduciary has discretion to determine benefits, the court is to utilize an abuse of discretion standard. *Id.* An ERISA fiduciary is said to abuse its discretion if it renders decisions without explanation, or construe provisions of the plan in a way that clearly conflicts with the plain language of the plan." *Atwood,* 45 F.3d at 1324; *Eley v. Boeing Co.,* 742 F.Supp. 566, 571 (W.D.Wash.1990), aff'd by 945 F.2d 276 (9th Cir.1991). Where the plan does not confer such discretion, the court reviews *de novo* any benefits decision by the administrator or fiduciary. *Id.*

■ Under either standard, the Court must base its determination on the record that was before the ERISA fiduciary at the time the decision was made. *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 (9th Cir.1999). Under the abuse of discretion standard, the Court reviews the administrative record to determine whether substantial evidence supports the administrator's decision. *Clark v. Washington Teamsters Welfare Trust,* 8 F.3d 1429, 1432 (9th Cir.1993). If so, then even though the record might support a contrary conclusion, the Court will uphold the ERISA plan administrator's decision. *See, e.g., Taft,* 9 F.3d, at 1473; *Eley v. Boeing,* 945 F.2d 276, 279 (9th Cir.1991). No such deference is afforded, however, in those cases where the de novo review standard is applied.

#### 2. Conflict of Interest and the De Novo Standard

■■ Even where the plan confers discretion on the ERISA fiduciary, the Court will apply the de novo standard to an administrator who is subject to a conflict of interest. *See, e.g., Hensley v. Northwest Permanente P.C. Retirement Plan,* 258 F.3d 986, 994 (9th Cir.2001); *McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1108 (9th Cir.2000). An apparent conflict exists, requiring further inquiry into the issue, when a plan is both funded and administered by an insurer. *Regula v. Delta Family–Care Disability Survivorship Plan,* 266 F.3d 1130, 1145 (9th Cir.2001), *vacated on other grounds,* 539 U.S. 901, 123 S.Ct. 2267, 156 L.Ed.2d 109 (2003);

*Lang v. Long–Term Disability Plan,* 125 F.3d 794, 797 (9th Cir.1997) (inherent conflict of interest exists when insurer administers plan). As the Court stated in *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1561 (11th Cir.1990), "Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business."

■ To determine whether such an apparent conflict has ripened into an actual conflict requires the Court to undertake an assessment of whether the conflict affects the decision. *Regula,* 266 F.3d, at 1145. This intermediate determination is made on what has been described as a "less deferential" standard, and permits the Court to consider material probative evidence submitted by the ERISA beneficiary to support the conflict of interest allegation. *See, e.g., Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1323 (9th Cir.1995). If the beneficiary meets its burden of presenting material probative evidence that an actual conflict exists, the burden shifts to the fiduciary to persuade the Court that its decision was not infected by the conflict. *Id.* If the Court concludes that the administrator was subject to an actual conflict of interest, then the Court will review the decision *de novo. Tremain v. Bell Indus. Inc.,* 196 F.3d 970, 976 (9th Cir.1999). ERISA jurisprudence identifies a number of non-exclusive factors that may

be considered as evidence that an actual conflict exists. *See, e.g., Siebert v. Standard Ins. Co. Group Long–Term Disability Policy,* 220 F.Supp.2d 1128, 1135 (C.D.Calif.2002) and cases cited therein. These factors include inconsistent behavior in dealing with a beneficiary, inconsistent reasons for denying benefits, and conduct that exhibits an adversarial attitude toward a beneficiary with the clear objective of denying the beneficiary's claim. *Id.*

### 3. Defendant Hartford Acted Under A Conflict Of Interest

■ In this case, the Plan provides: "We [Hartford] have full discretionary authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." [10] (Plan at 35). Hartford, however, acted in the dual role of both the funding source and the administrator of the Plan. Therefore, the Court is faced with an apparent or inherent conflict of interest, and must take this factor into account.

### (a) Hartford's Conflict

Plaintiff, the affected beneficiary, has provided material, probative evidence of serious breaches of fiduciary duty on the part of Hartford sufficient to transform this inherent conflict into an actual one. The evidence presented by Plaintiff establishes the following facts: [11]

---

**10.** The Plan defines the terms "We," "Us," and "Our" as The Hartford Life and Accident Insurance Company.

**11.** Although the record that was before the administrator, *i.e.* the facts known to the administrator or fiduciary, at the time the benefits decision was made furnishes the primary basis for review, *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 (9th Cir.1999), in this case, the "administrative record" presented

by Hartford omits information that it knew, or is charged with knowing, at the time Plaintiff's claim was partially · denied. The evidence presented by Plaintiff, which is not meaningfully denied by Hartford or Sargent Fletcher, establishes the following facts enumerated in the text and those facts are deemed to also be part of the administrative record and furnish the basis for this Court's review.

1) It is undisputed that the "evidence of good health" sought by Hartford was the completion of a document called a personal health statement. (Transcript at 6:9–16). These personal health statement forms were not given directly to employees by Hartford, but were given to Sargent Fletcher in an administrative kit. (Chandler Decl. Exh. A SF Alvarado Depo. at 0003–08, 0013, 0027–28). Sargent Fletcher was unaware prior to the submission of Plaintiff's claim that a personal health statement was required for enrollment because management never looked at the administrative kit. (*Id.* at 0027–28).

2) None of the applications for enrollment submitted by Sargent Fletcher employees seeking coverage for which a personal health statement was required prior to March 2002 were accompanied by such a personal health statement. (*Id.*).

3) An employee list was sent to and received by Hartford each month, identifying each employee, the type of coverage purchased, and the amount of premiums paid by the employee each month. (*See* Alvarado Depo. at 0009, 0054; Chandler Decl. Exhs. A31 & B thereto). Mr. Gaines was on the list and was identified as having purchased $150,000 in supplemental dependent life insurance coverage. (*Id.*). Hartford was, therefore, on notice of the amount of coverage obtained by Plaintiff, the identity of the insured, the amount of the coverage, and the amount (and fact of payment) of the appropriate premium.

4) Hartford, the party that admittedly undertook the responsibility of determining eligibility and making claim determinations, did not inform Plaintiff, or indeed any other Sargent Fletcher employee, that his or her application for enrollment was defective and that the application was consequently denied. (Chandler Decl. Exh. A, Alvarado Depo. at 0011; Gaines Decl. ¶¶ 4–5; Transcript at 23–24). Hartford has adduced no evidence the contrary, this fact can be unquestionably inferred from the administrative records, and, in any event, Hartford does not dispute this assertion by Plaintiff.

5) Hartford received and accepted payments by these employees, including Mr. Gaines, despite the fact that no notice was given that coverage was not perfected. (*See* Alvarado Decl. ¶ 10)

6) Hartford was requested by Sargent Fletcher to honor Plaintiff's claim because he had not been notified of the purported obligation to submit proof of his wife's health status as a condition to obtaining coverage. (Chandler Decl. Exh. A Exh. 17 at 0071). Hartford rejected the request out of hand. (Alvarado Depo. at 0027–28).

These facts, reviewed under the less deferential intermediate standard, provide strong evidence that Hartford behaved arbitrarily in rejecting Plaintiff's claim. That conclusion is further support by evidence in the record that establishes that Hartford reviews the list submitted by Sargent Fletcher, calculates the anticipated premium every month and sends a bill to Sargent Fletcher for each category of insured, including supplemental spousal life for those age forty-five to fifty. (Transcript at 26:9–12). Sargent Fletcher then remits its payment and notifies Hartford if there is a change in that particular class of coverage for that particular month. (*Id.* at 26:13–16). Accordingly, during the October 2001 enrollment period, Hartford had actual knowledge that coverage had been

changed and that the class of, insureds had increased. (*Id.* at 26:17–19).

Hartford initially denied receiving such a listing, but has since admitted, in both correspondence and oral argument, that it received the list. (*See* Chandler Decl. Exh. B). During oral argument, despite admitting receiving the list, Hartford continued to maintain that "it had no way of knowing" that Plaintiff had enrolled for such coverage, apparently on the basis of the manner in which it structured its relationship with Sargent Fletcher. Taking Hartford at its word, it accepted the list and the premium payments from Sargent Fletcher without obtaining the documentation indicating that the paid-for coverage had been "perfected." (*Id.* at 26:20–22). Thus, Hartford would contact Sargent Fletcher only in those instances in which Sargent Fletcher failed to respond to a bill for a particular month by tendering premiums. In those instances, Hartford's system automatically generated a lapse notice, and if payment was not timely received after that notice, the coverage for that group of insureds would be cancelled. (*Id.* 26:23–25, 27:1–3). Hartford contends that it employs this structure when the ERISA Plan is "self-administered." However, rather than exonerating Hartford and justifying its refusal to pay on Gaines's claim, the evidence that Hartford's system is designed to assure receipt of payment without a corresponding mechanism to insure that the beneficiary has properly qualified for the purchased benefit further supports the Court's conclusion that Hartford labored under a conflict of interest. In short, Hartford makes sure it gets paid, but makes no effort to assure that the beneficiary is getting what he or she paid for. This is a choice made by Hartford, but it hardly serves as support for its claim that it could not, in the exercise of reasonable diligence, have known

that Gaines purchased coverage for his wife, in the amount of $150,000.

Once again, Hartford seeks to avoid responsibility by pointing to the failings of Sargent Fletcher. Its effort is of no avail. By Hartford's own admission, and Sargent Fletchers's definition of "self-administered," Hartford utilizes Sargent Fletcher's role as Plan Administrator solely to carry out the most basic of ministerial, bookkeeping functions. Sargent Fletcher does not make determinations as to whether an employee's application for coverage is accepted or denied. Nor is it empowered with the ability to approve or disapprove coverage. Hartford admits that coverage determinations are at its sole discretion. (Objection to Gaines Decl. at 2). Thus, even in the context of carrying out its ministerial functions, logic dictates that Sargent Fletcher cannot notify an employee that coverage has been denied when Hartford has not communicated to Sargent Fletcher that there is a defect in the employee's enrollment application. Clearly, when the Plan is self-administered there is no safety mechanism to protect participants if either of their fiduciaries fails to execute their responsibilities with the requisite degree of competence and care.

In short, the design of Hartford's system permits it to act with selective knowledge—*i.e.* to be aware of coverage when payment is at issue but ignorant of the beneficiary's satisfaction (or not) of coverage requirements. Hartford can therefore maximize its profits, without, at the same time, maximizing the protection of beneficiaries who purchase Hartford's products through their ERISA plan. Instead, when disputes of the present sort arise, Hartford deflects liability by minimizing its role and blaming the employer. Based on these facts, the Court concludes that Plaintiff has presented substantial, material evidence of a conflict of interest, and that

Hartford has failed to rebut that presumption.

### (b) Sargent Fletcher

■ Sargent Fletcher, as the named Plan Administrator has full and sole discretionary authority to, among other things, modify the Plan. (Plan SPD at 39 ¶ 13).[12] Plaintiff, however, again satisfies its burden with respect to Sargent Fletcher. Sargent Fletcher, like Hartford, failed as a fiduciary to discharge its duties in accordance with ERISA standards. Due to those failings, it is now faced with the risk of liability to Hartford. Accordingly, it has an interest in aligning itself with Hartford to ensure that the denial of Plaintiff's claim is upheld. Thus, it too is a conflicted fiduciary.

### 4. The Benefits Decision Will Be Reviewed De Novo

Neither Hartford nor Sargent Fletcher has adduced evidence to rebut the presumption that the claim determination denying Plaintiff the supplemental dependent life insurance benefits was influenced by a conflict of interest. Thus, the decisions of both are entitled only to de novo review. On the basis of that review, the Court concludes that the plan administrators have erroneously construed terms of the Plan that are unmistakably ambiguous, and that they have otherwise breached their fiduciary duties to the Plaintiff. Thus, as explained in detail below, Plaintiff is entitled to recover the full amount of the benefit he purchased through his employer's ERISA plan.

### C. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO PLAINTIFF BY UTILIZING AN UNREASONABLE AND ERRONEOUS INTERPRETATION OF THE PLAN AND BY FAILING TO DISCHARGE THEIR DUTIES IN ACCORDANCE WITH ERISA REQUIREMENTS

Given that the de novo review standard applies, the question before the Court is whether defendants properly denied Gaines's claim under the terms of the Plan. That compels the Court to determine whether the Plan unambiguously required Gaines to submit evidence of his wife's health status as a condition to obtaining the supplemental life insurance benefit he claimed, and, if so, whether that condition is enforceable under the circumstances presented in this case.

### 1. The Plan Terms Must be Construed Against the Drafter and in Accordance with the Reasonable Expectations of the Insured

■ The interpretation of an ERISA plan is governed by federal common law. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Firestone*, 738 F.2d at 1499–1500. In developing that body of law, federal courts have drawn on analogous state law principles that are consistent with, and further the policies expressed in, ERISA and other federal labor laws. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121 (9th Cir.2002). Specifically, since many ERISA cases involve a wide variety of insurance plans, the Ninth Circuit has sought guidance in case

---

**12.** Although endowed with some discretion to alter the terms of the Plan, as already discussed, the record establishes—and it is undisputed—that Hartford assumed the role of the fiduciary charged with the task of making claim determinations and paying benefits to participants of the Plan. Sargent Fletcher, as the Plan Administrator, seems to have been responsible for more menial tasks such as furnishing employees with materials, conducting basic bookkeeping duties regarding to whom benefits were to be paid, deducting premium payments from employee paychecks, and performing preliminary tasks with regard to claims for benefits.

law interpreting insurance contracts. *Lang v. Long–Term Disability Plan*, 125 F.3d 794 (9th Cir.1997). As noted in *Lang,* the fundamental rule in dealing with the language of insurance contracts is to construe the plan language in an ordinary and popular sense as would a person of average intelligence and experience. *Id.* Such an approach requires the drafter to speak clearly and in plain English, and protects the reasonable expectations of plan participants. *See infra.*

### (a) The Doctrine of Contra Proferentem

■ If the terms remain ambiguous after applying ordinary principles of contract interpretation, the court is compelled to apply the rule of *contra proferentem.* The doctrine establishes the principle that ambiguities are strictly construed in favor of the insured. *Kearney,* 175 F.3d at 1090 (citing *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 942 (9th Cir.1995)). The rule follows from the principle that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter. *Lang v. Long–Term Disability Plan,* 125 F.3d 794, 799 (9th Cir.1997) (citing *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 537 (9th Cir.1990)). As demonstrated below, the Plan's terms are ambiguous and must be construed against Hartford.

### (b) The Doctrine of Reasonable Expectations

■ When the Plan terms are ambiguous, as is the case here, not only are they to be construed against the drafter under the doctrine of *contra proferentem,* but they are to be interpreted in accordance with the reasonable expectations of the insured. The doctrine of reasonable expectations applies when a provision in an insurance policy is not a clear, plain, and conspicuous statement excluding coverage under the relevant circumstances of the case. *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 386 (9th Cir.1994). The doctrine, which grew out of the state law of adhesion contracts and construction of ambiguities in insurance policies, has been formulated as follows:

> In general, courts will protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer.

*Id.* at 386.

■ The doctrine of reasonable expectations has been applied in ERISA litigation, *Saltarelli,* 35 F.3d at 386; *Lancaster v. U.S. Shoe,* 934 F.Supp. 1137 (N.D.Cal. 1996); *Henry v. Home Ins. Co.,* 907 F.Supp. 1392 (C.D.Cal.1995); *McClure v. Life Ins. Co. of N. Am.,* 84 F.3d 1129 (9th Cir.1996), and has been adopted in the Ninth Circuit as a principle of uniform federal common law informing interpretation of ERISA-governed insurance contracts. *See e.g., Saltarelli,* 35 F.3d at 386.[13] The cases incorporating the doctrine in ERISA litigation explain that the protection of the reasonable expectations

---

**13.** Plaintiff incorrectly approaches the doctrine of reasonable expectations as a theory of relief. As discussed at length in the text, the doctrine, is a state law standard of insurance policy or contract construction. *See Smith v. Westland Life Ins. Co.,* 15 Cal.3d 111, 123 Cal.Rptr. 649, 539 P.2d 433, (1975) (holding that construction of ambiguous contracts rests essentially upon the principle of effectuating the reasonable expectations of the ordinary applicant) (citations omitted).

of insureds appropriately serves the federal policies underlying ERISA, including provision of adequate information to plan participants and protecting their interests. *Id.* For the reasons discussed more fully below, Defendants' position that Plaintiff is not entitled to the full benefits for which he paid because he neglected to satisfy a prerequisite of coverage of which he was not made aware defeats the reasonable expectations of the insured. Accordingly, the "evidence of good health" requirement is unenforceable against Gaines.

### 2. The Plan Terms Discussing Evidence of Good Health Are Ambiguous

■ Here, the Plan contains ambiguities and missing terms and thus must be construed against the drafter (Hartford) and in accord with the reasonable expectations of the insured (Plaintiff) even if that interpretation is contrary to the actual intentions of the insurer. Most significantly, the evidence of good health exclusion of coverage in this case requires the cross referencing of several provisions of the Plan, and once that is done, it is still not clear what, if anything, is actually required on the part of the applicant to evidence good health. The plan term defining evidence of good health illustrates the point:

> Information *may* include questionnaires, physical exams, or written documentation *as required by Us.* Inquiries as to the status of your submission of evidence of good health should be addressed to your employer and/or benefit administrator. Your employer and/or benefit administrator will notify you of approvals. *We will notify you, in writing, of any disapprovals.*

(Plan at 22) (emphasis added). This language provides insufficient information to a plan participant, without some additional guidance, as to what, if anything, the participant must do to qualify for coverage.

The plan does not define "good health" or "evidence of good health." Moreover, it leaves ambiguous whether or not information must be provided to obtain coverage. Rather, it describes the type of information the *might* be requested, but only in cases where the information is *"required by us."* Further, while the document describes certain types of information that might be required, it suggests that other, undescribed materials, might be requested in addition to, or in lieu of, the enumerated items. This language is at least susceptible to an interpretation that such information will not be demanded in every case, and that if it is needed, the plan participant will be notified by the insurer of precisely what he or she must provide as a condition to obtaining coverage. All in all, the Plan's term regarding definition of good health could lead the insured to reasonably believe that if Hartford desired evidence of good health, it would ask for it, in whatever form it desired, *e.g.*, a personal health statement, a questionnaire, a physical exam, etc.

To address this issue, Hartford required the submission of a specific document—a so-called "personal health statement" that Hartford created and provided to Sargent Fletcher as a necessary item to obtain dependent life insurance coverage beyond the "Guarantee Issue Amount" of $20,000. However, the very existence of this "personal health statement" form belies Hartford's contention that employees, by merely reading the terms of the Plan without guidance or assistance from their fiduciaries, would understand what Hartford required as a condition to obtaining extended life insurance benefits. Indeed, because the Plan does not mention the form, reading the Plan would provide no assistance to a beneficiary attempting to determine his

or her obligations under the plan in regard to providing "evidence of good health." Because the Plan does not reference the "personal health statement," Hartford cannot be heard to argue that it can, without notice to the participants, require submission of the form as condition to coverage because a plan fiduciary or trustee may not construe a plan so as to impose an additional requirement for eligibility that is not disclosed in, or that is inconsistent with the terms of the plan. *Canseco*, 93 F.3d at 606. In fact, this Circuit, as well as others, have held that where a plan administrator, fiduciary, or trustee imposes a standard of eligibility for plan benefits not expressly required by the plan itself, that action results in an unwarranted and arbitrary construction of the plan. *Id.* (citations omitted).

Accordingly, to construe the Plan as requiring the submission of a personal health statement is unreasonable in Plaintiff's case, and the condition cannot be enforced against him.

### 3. The Duty to Notify of Disapprovals

 Prior to the submission of his claim, Gaines was never notified of Hartford's disapproval of his application for benefits because there was no such disapproval. Rather, it appears that Hartford now contends that it can disapprove the application after the claim for benefits has arisen. While this argument may be supported by the Plan language, that only goes to show that the relevant Plan language regarding disapprovals is also ambiguous and contains a trap for the wary and unwary alike. It does not specify when disapprovals must be made or to what type of disapprovals the clause pertains, such as limited disapprovals of evidence of good health, disapprovals of coverage itself, claim disapprovals, or all of these determinations. Further, the provision's physical placement in the Plan does not assist the Court in isolating when this duty is imposed on Hartford. In the section titled "When does coverage for your dependent start," coverage is said to commence upon Hartford's approval in those cases where for coverage that requires evidence of good health. Nevertheless, under the Plan terms, notification of approvals falls on Sargent Fletcher under the definition of "evidence of good health." Disapproval, on the other hand, is to be communicated by Hartford. How one is notified of an "approval" or "disapproval" is not explained anywhere in the Plan documents. From all of this, the Court concludes that an insured would reasonably believe that if his application was denied, for whatever reason, Hartford would notify him or her to that effect in writing. A plan participant would also reasonably conclude that he or she would be notified of the disapproval of his or her application within a reasonable time after the application was made, certainly before several months of premium payments were deducted and accepted and undoubtedly before a claim was made.[14] Under

14. This conclusion is supported by state court insurance jurisprudence. California courts, employing the reasonable expectations doctrine or ordinary person standard where the contract terms were ambiguous, have consistently held that coverage arises immediately upon receipt of the contemplated application and the **first** premium payment. Any "satisfaction" proviso merely gives the insurance company the right to terminate the contract **before issuing the policy** if dissatisfied and, in any event, termination is not effective until the insurer communicates the rejection by appropriate **notice and refunds the payment** to the insured. *See, e.g., Ransom v. The Penn Mutual Life Ins. Co.,* 43 Cal.2d 420, 274 P.2d 633 (1954); *Smith v. Westland Life Ins. Co.,* 15 Cal.3d 111, 123 Cal.Rptr. 649, 539 P.2d 433 (1975). *Once a claim is submitted, however, the right to terminate ceases unless*

such circumstances, a plan participant could reasonably assume that his application for coverage has been approved.

 Because the parties have entered into a contract, but have omitted a material term—the timing and means of providing notice of disapproval—the Court must supply a reasonable term that will carry out the reasonable expectations of the parties. 1 B.E. WITKIN SUM. OF CAL. LAW, *Contracts* § 691 (2003) (hereinafter "Witkin"). On the basis of the foregoing discussion, the Court concludes that a reasonable term would require Hartford to provide written notification of denial of coverage once it has been placed on notice of the application for benefits and before accepting premium payments. Because no such disapproval was communicated to Plaintiff in this case, and because Hartford accepted premium payments from Plaintiff (and indeed from numerous other employees) and only disputed coverage when Plaintiff submitted a claim on his wife's death, the Court concludes that Hartford's conduct, if permitted to stand, would defeat Plaintiff's reasonable expectations. Hartford's determination that Plaintiff lacked coverage without ever notifying him of any defect in his application, conduct that falls far short of its fiduciary

obligations (*see infra*), conflicts with any reasonable interpretation of the Plan language committing Hartford to notify applicants of disapprovals.[15] Under any reasonable interpretation of the Plan, and giving due consideration to ERISA principles governing the conduct of fiduciaries, the Court concludes that Hartford cannot now deny Plaintiff's claim.

### 4. Sargent Fletcher's and Hartford's Failure to Satisfy ERISA's Procedural Standards Governing Fiduciary Conduct

 The management at Sargent Fletcher was unaware of the evidence of good health requirement because it never read the Plan. Likewise, it was unaware that such evidence was desired in the form of a personal health statement because it never looked at the administrative kit which contained those forms. Consequently, Sargent Fletcher failed to determine what forms were required to successfully enroll its employees in the Plan and failed to give the personal health statement form to employees. Without these forms, these employees were unable to obtain coverage from Hartford. The only parties in a position to know that the enrollment applications were incomplete were Sargent Fletcher and Hartford.

there is evidence of fraud. *Thompson v. Occidental Life Ins. Co.*, 9 Cal.3d 904, 109 Cal. Rptr. 473, 513 P.2d 353 (1973).

15. Hartford admits that it had the sole discretion to approve or disapprove coverage, (Objection to Gaines Decl. at 2), yet it never informed any Sargent Fletcher employees, including Plaintiff, in writing or otherwise, that their applications were defective and that coverage had been disapproved. Despite Hartford's admission, in its reply it states: "Defendants agree that the Plan provides that Hartford will inform participants if it disapproves of their Evidence of Good Health. Here, no duty to inform ever arose because Plaintiff never submitted any evidence of good health. Hartford cannot approve or

disapprove of evidence it never receives." (Reply at 4). The Court finds this position untenable. The provision does not say "disapprovals of evidence of good health." It merely states "disapprovals," without further modification. It does not even specify if the disapproval relates to coverage itself, to claim determinations, to the application for benefits, or something else entirely. Moreover, this provision's placement in the Plan does not assist the Court in isolating when this duty is imposed on Hartford. The argument stands the facts on their head, and seeks to place blame for the alleged defective application on the Plaintiff, when the fault in fact lies with Defendants.

This imbalance of knowledge and Defendants' failure to discharge their fiduciary duties with the requisite degree of care amount to serious ERISA violations.[16]

### (a) ERISA's Disclosure Requirements

First and foremost, ERISA seeks "to safeguard the well-being and security of working men and women and to apprise them of their rights and obligations under any employee benefit plan." *Id.* at 1356 (citation omitted). For this reason, a writing is required under ERISA so that every employee, on examining the plan documents, is able to determine *exactly* what his or her rights and obligations are under the Plan. *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *Blau,* 748 F.2d at 1354 (stating that imposition of a standard not contained in the terms of the plan amounts to an arbitrary and capricious decision); 29 U.S.C. § 1102(a)(1).

■ In addition, 29 U.S.C. § 1021(a) provides that the summary plan description be furnished to a plan's participants and beneficiaries. 29 U.S.C. § 1022(b) states that the summary plan description must contain, among other things, the plan's requirements respecting eligibility for participation and benefits and the circumstances which may result in disqualification, ineligibility, or denial or loss of benefits. This information must be accurate, comprehensive, and written in a manner understandable to the average participant. 29 U.S.C. § 1022(a).

By failing to provide the personal health statement form to employees, and indeed, by not even knowing of its existence, Sargent Fletcher committed a disclosure violation that altered the substantive relationship between the fiduciaries and the employee beneficiaries that ERISA disclosure duties seek to balance somewhat more equally. *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1354 (9th Cir.1984). Without the personal health statement form, the Plan terms discussing "evidence of good health" were rendered meaningless. By failing to inform itself of the plan's requirements regarding evidence of good health, Sargent Fletcher misled participants into believing that they had successfully completed all conditions to coverage.[17]

■ Likewise, Hartford's failure to expressly require the submission of a personal health statement in the Plan or SPD in violation of 29 U.S.C. §§ 1021(a), 1022(b) deprived participants of notice of the form of evidence of good health required to obtain coverage. *See also Canseco,* 93 F.3d at 606 (holding that when a fiduciary imposes a standard of eligibility not expressly disclosed in the Plan, it engages in unwarranted and arbitrary construction of the Plan). Ultimately, Hartford's undis-

---

**16.** Although Defendants' violations were procedural, under ERISA no great wall divides procedural from substantive violations because procedural requirements alter the balance of rights and knowledge between beneficiaries and their employees and therefore serious procedural violations can work a substantive harm. *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1353–54 (9th Cir.1984). If a fiduciary's procedural shortcomings work such a substantive harm on the claimant or cause a substantive ERISA violation, relief is warranted. *Atwood,* 45 F.3d at 1325. Thus, in reviewing a fiduciary's conduct, a court must consider continuing procedural violations to determine whether the decision to deny benefits was infected by its having been made in conformity with an objectionable scheme that worked a substantive harm on the claimant. *Blau,* 748 F.2d at 1354. The Court concludes such is the case here.

**17.** Since Hartford was apparently relying on Sargent Fletcher to provide this information, it did nothing to cure the problems created by the Sargent Fletcher's failure to disclose.

closed personal health statement requirement in conjunction with Sargent Fletcher's delinquent administration resulted in the very evils against which ERISA was enacted to guard against—insecurity, lack of knowledge, and the inability to police plan administration—working a substantive harm on this Plaintiff. *See Blau,* 748 F.2d at 1353–54.

#### (b) Minimum Standards for a Reasonable Claim Procedure Set Forth in the Code of Federal Regulations

 The Code of Federal Regulations establishes the minimum requirements for employee benefit plan procedures pertaining to claims for benefits and mandates that a claim procedure will be deemed reasonable only if:

> The claims procedures do not contain any provision, and are not administered in a way, that unduly inhibits or hampers the initiation or processing of the claim for benefits.... [T]he denial of a claim for failure to obtain a prior approval under circumstances that would make obtaining such prior approval *impossible* ... would constitute a practice that unduly inhibits the initiation and processing of a claim.

29 C.F.R. § 2560.503–1(a), (b)(3) (emphasis added). Similarly, under basic principles of contract law, impossibility generally excuses breach and renders the impossible contract term unenforceable. WITKIN §§ 772, 773. In addition, 29 C.F.R. § 2560.503–1(b)(2), (5) requires a reasonable claim procedure to contain administrative processes and safeguards designed to ensure and verify that benefit claim determinations are made in accord with plan documents. This regulation undoubtedly has its genesis in Congress's statutory declaration of ERISA policy, which states that "owing to the lack of employee information and adequate safeguards concerning [plan] operation, it is desirable in the interests of employees and their beneficiaries [dependents] ... that disclosure be made and *safeguard be provided* with respect to the establishment, operation, and *administration* of such plans." 29 U.S.C. § 1001(a) (emphasis added).

By failing to provide the personal health statement form, Sargent Fletcher made performance under Hartford's construction of the Plan terms impossible, thereby unduly inhibiting the claims procedure. The same is true of Hartford, who never notified employees that they had failed to qualify for the coverage, yet continued to accept premium payments so that employees were never on notice that they needed to cure defects in order to obtain coverage. Thus, both Defendants rendered it impossible for employees, including Plaintiff, to obtain the required prior approval of their evidence of good health. In addition, Hartford's failure to construct a system to ensure that coverage is properly in place before accepting premium payments violated the requirement that safeguards be in place to ensure adequate administration of the Plan and that benefit claim determinations are made in accordance with the Plan documents.

These factors weigh heavily against Sargent Fletcher and Hartford. Under either standard of review, their respective failures to adequately inform employees and Sargent Fletcher's failure to even look at the documents necessary to fulfill its obligations as Plan Administrator rendered administration of the Plan inherently unreasonable.

#### D. DEFENDANTS' CONDUCT CONSTITUTED A WAIVER OF THE EVIDENCE OF GOOD HEALTH REQUIREMENT

 Plaintiff claims that Defendants have waived any right to deny that he is entitled to benefits because his enrollment

application contained no evidence of good health. Although this Circuit has yet to rule on the issue, the doctrine of waiver has been employed by a number of circuits in ERISA cases. *See e.g., Burger v. Life Ins. Co.,* 103 F.Supp.2d 1344, 1348 (N.D.Ga.2000) (Insurer waived its right to offset part-time income when it continued to pay full benefits with the knowledge that insured was working part time); *Pitts v. Am. Sec. Life,* 931 F.2d 351, 357 (5th Cir.1991) (Insurer waived right to assert plan defense by accepting premium payments and payment of benefits without a reservation of rights); *Rhorer v. Raytheon Eng'rs & Constructors, Inc.,* 181 F.3d 634, 645 (5th Cir.1999) (Question of fact as to whether insurer waived "active at work" requirement when it accepted life insurance application and premiums from insured without knowledge that he was ill and working part-time from home); *Lauder v. First UNUM Life Ins. Co.,* 284 F.3d 375, 380–81 (2d Cir.2002); *Furleigh v. Allied Group Inc.,* 281 F.Supp.2d 952, 973 (N.D.Iowa 2003).

 Waiver is the voluntary or intentional relinquishment of a known right. *Rhorer,* 181 F.3d at 645 (quoting *Pitts,* 931 F.2d at 357). Generally speaking, waiver is unavailable when it would expand the scope of coverage under an ERISA plan. Here Sargent Fletcher and Hartford knew that Plaintiff (and indeed many others) had not submitted a personal health statement, knew of the coverage being purchased, knew that premiums were being paid for that coverage, and received and accepted payments without giving any indication that any of the Sargent Fletcher employees had failed to comply with a precondition to obtaining insurance coverage. The Court finds that conduct sufficient to constitute a voluntary relinquishment of the right to require submission of a personal health statement. Moreover,

giving effect to the waiver in this case does not expand the scope of the ERISA plan; rather it provides the Plaintiff with an available benefit for which he paid. Thus, the Court finds that application of the waiver doctrine is appropriate under present circumstances.

In support of its argument that the equitable doctrine of waiver is inapplicable in this case, Defendant Hartford relies heavily on *Blum v. Spectrum Restaurant Group, Inc.,* 261 F.Supp.2d 697 (E.D.Tex. 2003). That case involved Hartford and virtually identical Plan language to that in this case. *Id.* at 703. The insured, who was denied benefits for supplemental life insurance after her spouse died, received numerous notifications from the third party entrusted with administration of the plan that coverage had not been obtained because no evidence of good health had been submitted. *Id.* 702–07. Moreover, the administrator sent the insured the forms necessary to satisfy the evidence of good health requirement. *Id.* at 704. After months of notifications that the plaintiff had not qualified for the coverage it sought, due to a computer error, *one* premium payment was deducted from the insured's paycheck, but was promptly returned. *Id.* at 705. The facts presented in *Blum* are entirely distinguishable from those presented in this case. In that respect, not only is *Blum* of no assistance to Hartford, it seriously undermines their position and gives credence to the common sense truth asserted *supra*—that Plaintiff was entitled to notice that he had failed to qualify for coverage before premium payments were deducted from his paychecks and accepted by Hartford.

## E. DEFENDANTS ARE ESTOPPED FROM ASSERTING THAT PLAINTIFF FAILED TO PROVIDE EVIDENCE OF HIS WIFE'S GOOD HEALTH

 The only theory of relief contained in the complaint that is addressed by ei-

ther Defendant in their respective summary judgment motions is whether they are estopped from enforcing the evidence of good health provision. This Circuit has recognized that federal equitable estoppel principles can, in certain circumstances, apply to some claims arising under ERISA. *Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir.1992). These circumstances are limited to situations in which an employee relied to his detriment on representations made with regard to ambiguous language in a benefit plan. *Id.*

 As discussed *supra,* the Plan contains several ambiguous—if not misleading—terms, the most notable being the term "evidence of good health." If one references the section titled "What is Evidence of Good Health," the language would lead the insured to reasonably believe that if Hartford desired evidence of good health, it would have asked for it, in whatever form it desired. Indeed, Hartford attempted to do exactly that by providing a specific form—the personal health statement form—to Sargent Fletcher in which employees were to evidence their dependent's good health. That form was never provided to any Sargent Fletcher employee. Moreover, from the ambiguous Plan language an insured would reasonably be misled to believe that if his application was denied for whatever reason, Hartford would notify him in writing. Instead, Sargent Fletcher collected premium payments from individual employees, including Plaintiff, for months—premium payments which Hartford gladly accepted—and only after a claim was submitted, contended that the individuals were never insured. Without any Plan language lending guidance to the contrary, such deductions and acceptances of premium payments certainly qualify as representations upon which Plaintiff could rely.

The four federal common law elements of equitable estoppel that are applicable to an ERISA action are:

1) The party to be estopped must know the facts;

2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

3) the latter must be ignorant of the true facts; and

4) he must rely on the former's conduct to his injury.

*Id.*

Having recited the relevant facts more than once in the discussion above, the Court need to state them again. Those facts clearly demonstrate that the doctrine of estoppel applies in this case. Defendants knew, or are charged with knowledge of the relevant facts, and clearly acted in such a way that they intended Plaintiff to act by purchasing the supplemental life insurance coverage on his wife. Plaintiff was ignorant of the relevant facts regarding evidence of good health, he relied on the conduct of defendants in purchasing that coverage, and did so to his detriment. This case, therefore, presents the classic scenario for application of the equitable doctrine of estoppel.

## F. REMAND TO HARTFORD IS NOT APPROPRIATE

Hartford argues that if the Court denies its motion for summary judgment, it must remand this matter for further administrative consideration. Hartford relies on *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan,* 85 F.3d 455, 461 (1996), for this proposition. In *Saffle,* the Ninth Circuit held that where a plan administrator misconstrues a plan, the court should not determine whether benefits are to be awarded under a proper construction of the plan; instead,

it should remand to the plan administrator for it to make a determination under the plan, properly construed. In that case, the fiduciary's determination was reviewed for an abuse of discretion. The circumstances described in *Saffle*, are inapposite here.

 Here the Court concludes that given Hartford's actual conflict of interest and breaches of fiduciary duty, its determination to deny Plaintiff his full benefits and its interpretation of the Plan as requiring Plaintiff to adduce evidence through the completion of a form he had no way of knowing existed be reviewed *de novo*. Despite the fact that Plaintiff argues that Defendants are only entitled to this less deferential standard of review, Hartford has supplied the Court with no authority for the proposition that a fiduciary who is deemed to have been motivated by something other than its primary duty to the plan and its participants, who has engaged in breaches of its fiduciary duty, and whose determinations are reviewed de novo is entitled to remand in order to engage in further review of the matter. To the contrary, the Ninth Circuit, in *Lang v. Long–Term Disability Plan*, 125 F.3d 794 (1997) determined that the conflicted fiduciary's tainted determination be reviewed de novo, and, rather than ordering that the matter be remanded to the compromised administrator, instructed the district court to enter judgment in favor of the beneficiary. *Id.* at 800.

In addition, remand of this matter would serve no purpose and would function merely as an empty formality. Here, there are no additional factual determinations to be made and reevaluation of the merits of Plaintiff's claim is not required. *See Canseco v. Constru. Laborers Pension Trust for S. Cal.*, 93 F.3d 600, 609 (1996) (holding that remand to the administrator was not warranted); *Rigg v. Continental Cas. Co.*, 2004 U.S. Dist. LEXIS 8009, *20 (N.D. Cal. May 5, 2004) (finding that remand was not appropriate because the undisputed facts conclusively demonstrated that the Plaintiff was entitled to benefits).

Hartford argues that it must make factual determinations regarding Mrs. Gaines's eligibility for benefits given that she apparently suffered from heart disease for years and therefore may not have been qualified for coverage. The time for that determination passed when Hartford commenced accepting premium payments without requiring evidence of good health. Whether Hartford would, or would not, have approved the application at that time is immaterial to the decision of this Court. Gaines complied with his contractual obligations as he reasonably understood them, and therefore the only thing left at this point is the enforcement of Hartford's obligation to pay the benefit. The Court concludes that the only reasonable interpretation of the Plan and only acceptable outcome of this dispute is that Mr. Gaines is entitled to and be awarded the full benefits for which he paid. Accordingly, remand is DENIED and judgment is entered in favor of Plaintiff.

## IV.

## CONCLUSION

Defendants' respective motions for summary judgment are **DENIED**. The Defendant's request for remand is also **DENIED**. Based on its de novo review of the determination denying coverage, the Court concludes that Gaines is entitled to receive the full benefit he reasonably concluded he had purchased under the plan—a $150,000 life insurance policy on his-wife. As there is no dispute that she has died, and as there is no dispute that Hartford has paid $20,000 to Plaintiff, the Court therefore concludes that Hartford must now pay him the additional $130,000 due and owing un-

der the policy, together with interest thereon Plaintiff is to submit an appropriate form of judgment for signature by the Court.

IT IS SO ORDERED.